# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RYAN SCOVILLE

               Plaintiff,

     v.

U.S. DEPARTMENT OF STATE,

               Defendant.

Case No. 2:22-cv-00091-NJ

## PLAINTIFF RYAN SCOVILLE'S STATEMENT OF PROPOSED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56(b)(1)(C) of the Local Rules for the Eastern District of Wisconsin, Plaintiff Ryan Scoville submits the following Statement of Proposed Material Facts in support of his Motion for Summary Judgment. Exhibit numbers refer to the exhibits to the Declaration of Tobin Raju.

**Parties and Background**

1.     **Plaintiff Ryan Scoville is a professor of law at Marquette University Law School.** Raju Decl. Ex. 3 ("Scoville Decl.") ¶ 1.

2.     **Professor Scoville teaches and writes about U.S. foreign relations law, international law, and domestic law regulation of U.S. diplomatic activities.** Scoville Decl. ¶¶ 1, 5-6, 11.

3.     **In connection with his academic research, Professor Scoville has submitted six FOIA requests to State since 2014, and he intends to make such requests in the future.** Scoville Decl. ¶¶ 8, 19, 25, 31, 37, 42, 57, 72.

**4.** **The work of Professor Scoville and various scholars, journalists, and government accountability organizations requires access on a recurring basis to State's records that contain information unavailable elsewhere.** Scoville Decl. ¶¶ 7, 9-12; Raju Decl. Ex. 12 ("McCraw Decl.") ¶¶ 5-8 (*New York Times* explains that State Department "records are often the best source of detailed, contemporaneous, and original information about government activities," and are "more reliable" and "irrefutable" than oral statements and memories); Raju Decl. Ex. 8 ("Sus Decl.") ¶ 12 (Citizens for Responsibility and Ethics in Washington (CREW) explains that "records obtained through FOIA bear the official imprimatur of the U.S. government" and "are more reliable than other sources of information"); Raju Decl. Ex. 7 ("Eddington Decl.") ¶¶ 10, 17, 39 (FOIA access to State records critical to reporting by Cato Institute Senior Fellow and to work reforming U.S. counterterrorism activities and strengthening protections for citizens abroad); Raju Decl. Ex. 14 ("Morisy Decl.") ¶ 16 (obtaining State records through FOIA is essential to the work of government accountability organization MuckRock "advancing public awareness, conducting oversight, and engaging in informed advocacy"); Raju Decl. Ex. 16 ("Leopold Decl.") ¶¶ 7, 12 (access to State records is critically important to Bloomberg News journalist because the information is often unavailable elsewhere); Raju Decl. Ex. 15 ("Hathaway Decl.") ¶¶ 7, 13, 14, 32 (access to State records essential to law professor who writes and furnishes information to Congress about international law and diplomacy); Raju Decl. Ex. 6 ("Matthews Decl.") ¶¶ 9, 13 (college professor relies upon FOIA requests to obtain information on internal deliberations at State that "is not available from other sources"); Raju Decl. Ex. 11 ("McBride Decl.") ¶ 11; Raju Decl. Ex. 5 ("Anthony Decl.") ¶ 16; Raju Decl. Ex. 9 ("Diakun Decl.") ¶ 10; Raju Decl. Ex. 13 ("Tobias Decl.") ¶ 11; Raju Decl. Ex. 10 ("Monaghan Decl.") ¶ 19; *see also* Raju Decl. Ex. 40, Department of State FOIA Request Log 3rd Quarter FY 2023 (showing FOIA

request by Matthews); Raju Decl. Ex. 39, Department of State FOIA Request Log 4th Quarter FY 2022 (showing FOIA request by McBride); Raju Decl. Ex. 41, Department of State FOIA Request Log 3rd Quarter FY 2023 (showing FOIA request by Tobias).

5. **A failure by State to provide timely responses to FOIA requests severely impedes the work of Professor Scoville and other scholars, journalists, and government accountability organizations that have a recurring need for access to State's records.** Scoville Decl. ¶¶ 7, 13-14, 24, 41, 56, 68-73; McCraw Decl. ¶¶ 5-8, 15, 19, 26, 30, 34 (describing the crucial role of FOIA requests to State in developing several news stories and the "significant obstacle" presented when reporters face years-long delays in obtaining information while their stories lose relevance and immediacy); Tobias Decl. ¶¶ 21, 25, 29, 30 (State's failure to make timely production of requested records has "significantly hindered" journalist's ability to report on issues of public interest, reduced effectiveness, and increased uncertainty); Sus Decl. ¶ 11 (describing need for timely access to records requested from State for CREW to inform the public of pertinent developments before information becomes stale or obsolete); Morisy Decl. ¶¶ 7-8, 17 (MuckRock describes the importance of timely FOIA responses to reporting on matters of public interest); Matthews Decl. ¶¶ 6, 12 (college professor describes how timely FOIA access to State records is "essential" to research and publish information on issues of public concern); McBride ¶ 6 (UCLA scholar explains that "use of primary source documents is the lifeblood of the historical profession. Without unfettered access to US documents on the Cold War, it would be impossible to write histories of this time period"); Anthony Decl. ¶ 41 (detailing how records produced by State enabled American Oversight to compile timeline of events of January 6, 2021); Hathaway Decl. ¶¶ 7, 27, 32, 43 (law professor describes how FOIA delays required delay of law review

article and hindered ability to advise Congress and monitor State's compliance with disclosure requirements regarding nonbinding international agreements made outside purview of Congress).

**Definitions and State's Formal FOIA Policies**

6. **State's FOIA Annual Report for fiscal year 2024 defines a "processed request or processed administrative appeal" as "a request or administrative appeal for which an agency has taken final action in all respects."** Raju Decl. Ex. 29 ("State's Fiscal Year 2024 FOIA Annual Report"), at 11.

7. **State's FOIA Annual Report for fiscal year 2024 defines a "perfected request" as "a request for records that reasonably describes the requested information and is made in accordance with the agency's published regulations."** State's Fiscal Year 2024 FOIA Annual Report, at 10.

8. **State's FOIA Annual Report for fiscal year 2024 defines "backlog" as "the number of perfected requests or administrative appeals that are pending at an agency at the end of the fiscal year that are beyond the statutory time period for a response."** State's Fiscal Year 2024 FOIA Annual Report, at 8.

9. **State's FOIA Annual Report for fiscal year 2024 defines the "range in number of days" as "the lowest and highest number of days to process requests or administrative appeals.**" State's Fiscal Year 2024 FOIA Annual Report, 11.

10. **Each State FOIA Annual Report covers one fiscal year, the period from October 1 through September 30.** *See, e.g.*, State's Fiscal Year 2024 FOIA Annual Report, at 1.

11. **State's FOIA Annual Report for fiscal year 2024 defines a "simple request" as a "FOIA request that an agency using multi-track processing places in its fastest (non-expedited) track based on the low volume and/or simplicity of the records requested."** State's Fiscal Year 2024 FOIA Annual Report, at 9-10.

4

12.     State's FOIA Annual Report for fiscal year 2024 defines a "complex request" as "a FOIA request that an agency using multi-track processing places in a slower track based on the high volume and/or complexity of the records requested." State's Fiscal Year 2024 FOIA Annual Report, at 9-10.

13.     State's FOIA Annual Report for fiscal year 2024 states that "an agency . . . process[es] a FOIA request on an expedited basis when a requester satisfies the requirements for expedited processing as set forth in the statute and in agency regulations." State's Fiscal Year 2024 FOIA Annual Report, at 10.

14.     State processes requests in each track on a first-in, first-out basis. 2024 Annual Report at 10; Raju Decl. Ex. 55 ("SCO_414") (listing "Litigation" as top priority, followed by "Litigation referrals from other agencies," "Expedited Requests," Expedited Referrals," "Appeals," and the last priority listed is "All other cases – First In, First Out" including "Direct requests to the Department"); Raju Decl. Ex. 67 ("SCO_14421") ("The FOIA program is currently focused on complying with court ordered productions in FOIA litigation cases, closing its oldest cases following the 'First In, First Out' (FIFO) approach, and providing responses to expedited requests").

**State's Prolonged Non-Compliance Processing**
**Professor Scoville's April 16, 2014 Request**

15.     On April 16, 2014, Professor Scoville submitted a FOIA request (Request No. F-2014-06682) to State seeking records about ambassadorial nominees. Scoville Decl. ¶ 19.

16.     On May 7, 2014, State provided an estimated date of completion ("EDC") of December 2014 for the April 16, 2014 FOIA request, but subsequently extended the EDC four times to January 31, 2017. Scoville Decl. ¶ 20.

17. State's first substantive response to Professor Scoville's April 16, 2014 FOIA request came on May 29, 2015, when State directed him to where he could access a small portion of the requested documents related to ambassadorial nominations from 2013. Scoville Decl. ¶ 21.

18. By January 2017, State had produced some additional documents. Scoville Decl. ¶ 21.

19. Professor Scoville filed suit against State on May 19, 2017, to compel the production of the remaining records responsive to the April 16, 2014 request. Scoville Decl. ¶ 22.

20. State completed processing Professor Scoville's April 16, 2014 FOIA request in May 2018, nearly 49 months after the documents were requested. Scoville Decl. ¶ 23.

**State's Prolonged Non-Compliance Processing**
**Professor Scoville's March 10, 2016 Request**

21. On March 10, 2016, Professor Scoville submitted a FOIA request (F-2016-01912) to State, seeking records related to the reports the President submitted to the Senate Foreign Relations Committee under 22 U.S.C. § 3942(a)(2)(B) concerning envoy appointments. Scoville Decl. ¶ 25.

22. In August 2016, State informed Professor Scoville that the EDC for the March 10, 2016 FOIA request was May 28, 2017. Scoville Decl. ¶ 26.

23. No documents were produced in response to the March 10, 2016 FOIA request by the May 28, 2017 EDC. Scoville Decl. ¶ 26.

24. Four months later, on September 26, 2017, State informed Professor Scoville that the delay in processing the March 10, 2016 request was due to State's "FOIA backlog of

6

approximately 13,200 cases" and stated that it "could take until September 2019 to complete its processing." Scoville Decl. ¶ 28.

25.     **State produced no records responsive to the March 10, 2016 FOIA request by July 3, 2019.** Scoville Decl. ¶ 29.

26.     **Professor Scoville filed suit against State on July 3, 2019, to compel the production of the records responsive to the March 10, 2016 request.** Scoville Decl. ¶ 29.

27.     **On August 12, 2021, State claimed that its processing of the March 10, 2016 request was complete, 65 months after the documents were requested.** Scoville Decl. ¶ 30.

**State's Prolonged Non-Compliance Processing**
**Professor Scoville's October 21, 2016 Request**

28.     **On October 21, 2016, Professor Scoville submitted a FOIA request (F-2016-13984) to State, seeking copies of Chief of Mission Leadership Surveys and responses created between approximately 2012 and 2016.** Scoville Decl. ¶ 31.

29.     **In March 2017, State informed Professor Scoville that two searches had been initiated on the October 21, 2016 FOIA request and set an EDC of December 31, 2017.** Scoville Decl. ¶ 33.

30.     **State produced no records responsive to the October 21, 2016 FOIA request by December 31, 2017.** Scoville Decl. ¶ 33.

31.     **Professor Scoville filed suit against State on July 3, 2019, to compel the production of the records responsive to the October 21, 2016 FOIA request.** Scoville Decl. ¶ 34.

32.     **State made its first production of records responsive to the October 21, 2016 FOIA request on September 2019.** Scoville Decl. ¶ 35.

7

33. **State completed processing Professor Scoville's October 21, 2016 FOIA request in December 2019, 39 months after the documents were requested.** Scoville Decl. ¶ 36.

**State's Prolonged Non-Compliance Processing**
**Professor Scoville's February 17, 2018 Request**

34. **On February 17, 2018, Professor Scoville submitted a FOIA request (F-2018-01436) to State, seeking records related to agreements withheld from publication under 1 U.S.C. § 112a(b)(2)(D) that were not exempt from disclosure under the Freedom of Information Act.** Scoville Decl. ¶ 37.

35. **Having received no documents, Professor Scoville filed suit against State 16 months later, on July 3, 2019, to compel the production of the records requested on February 17, 2018.** Scoville Decl. ¶ 39.

36. **In January 2020, State completed processing Professor Scoville's February 17, 2018 and produced just one record, nearly 2 years after the FOIA request was submitted.** Scoville Decl. ¶ 40.

**State's Prolonged Non-Compliance Processing**
**Professor Scoville's March 4, 2020 Request**

37. **On March 4, 2020, Professor Scoville submitted a FOIA request to the State Department Office of Information Programs and Services seeking certain reports submitted to Congress regarding "defense articles," a term defined by State Department regulations (*see* 22 CFR § 120.6) to include various military equipment.** Scoville Decl. ¶ 42.

38. **Professor Scoville's March 4, 2020 request sought the following records for the time period from January 20, 2001 to January 20, 2020:**

    a. **All reports submitted to Congress pursuant to 22 U.S.C. § 2753(a). These reports concern agreements for use and transfer restrictions pertaining to defense articles.**

8

b.     All reports submitted to Congress pursuant to 22 U.S.C. § 2753(c)(2).
These reports concern violations of agreements for use, safeguard, or
transfer restrictions pertaining to defense articles.

c.     All reports submitted to Congress pursuant to 22 U.S.C.
§ 2753(c)(3)(A). These reports concern presidential determinations that a
country is ineligible for further deliveries of defense articles due to violations
of use, safeguard, or transfer restrictions.

d.     All reports submitted to Congress pursuant to 22 U.S.C. § 2753(e).
These reports concern defense article transfers made without the president's
consent.

Scoville Decl. ¶ 42.

39.     Professor Scoville's March 4, 2020 request sought a fee waiver under 5 U.S.C.
§ 552(a)(4)(A)(ii)(II) as an affiliate of an "educational or noncommercial scientific
institution, whose purpose is scholarly or scientific research." Scoville Decl. ¶ 43.

40.     On March 24, 2020, Professor Scoville received an email from
A_FOIAacknowledgement@groups.state.gov that acknowledged receipt of the March 4,
2020 request and assigned it reference number F-2020-04794. Scoville Decl. ¶ 44.

41.     The March 24, 2020 email stated that the Office of Information Programs and
Services would "not be able to respond within the 20 days provided by the statute due to
'unusual circumstances' . . . includ[ing] the need to search for and collect requested records
from other Department offices or Foreign Service posts." Scoville Decl. ¶ 44.

42.     The email did not specify "the date on which a determination is expected to be
dispatched" or offer Professor Scoville "an opportunity to arrange with the agency an

9

alternative time frame for processing the request" pursuant to 5 U.S.C. § 552(a)(6)(B). Scoville Decl. ¶ 44.

43. Professor Scoville received no further communication from State about his March 4, 2020 request, so on February 22, 2021, his counsel sent an email to FOIAstatus@state.gov on his behalf seeking an update on the status of the March 4, 2020 FOIA request. Scoville Decl. ¶ 45.

44. State did not respond to the February 22, 2021, email. Scoville Decl. ¶ 45.

45. On February 28, 2021, Plaintiff's counsel attempted to follow up by telephone, and in a return call from the FOIA Requester Service Center, Plaintiff's counsel were directed to contact the office by email again. Scoville Decl. ¶ 46.

46. On March 2, 2021, Plaintiff's counsel sent another email to FOIAstatus@state.gov, as directed, seeking an update on the status of the March 4, 2020 FOIA request. Scoville Decl. ¶ 46.

47. On March 3, 2021, Plaintiff's counsel received an email from FOIAstatus@state.gov stating that "[t]his request is in process and has a March 8, 2023, estimated date of completion (EDC)." Scoville Decl. ¶ 47.

48. State did not inform Plaintiff of the EDC until March 3, 2021 despite logging that EDC in its own FOIA request processing system, FOIAXpress, months earlier in June 2020. Scoville Decl. ¶ 48.

49. Plaintiff's counsel sought clarification that State's EDC was really two years away, and on March 23, 2021, the agency confirmed that March 8, 2023, was its EDC. Scoville Decl. ¶ 47.

50.     On March 31, 2021, Plaintiff's counsel filed an appeal of the March 4, 2020 FOIA request with the State Department FOIA Appeals Officer. Scoville Decl. ¶ 49.

51.     State responded on March 31, 2021, stating that the request was "not subject to administrative appeal" at this time, since no specific material has been denied, but noting that requestors who do not receive a response within the statutory time limit of 20 business days have exhausted their administrative remedies and are entitled to file suit in federal court. Scoville Decl. ¶ 49.

52.     Having received no responsive documents nearly two years after submitting the request, Professor Scoville filed this lawsuit on January 25, 2022. Scoville Decl. ¶ 50

53.     On November 1, 2023, counsel for State informed Plaintiff's counsel that a production of documents "should be ready very soon," and noted on November 9, 2023, that the anticipated production would not be the final production. Scoville Decl. ¶ 52.

54.     On December 2, 2024, State made its first production in response to the March 4, 2020 FOIA Request. Scoville Decl. ¶ 53.

55.     State's December 2, 2024 production consisted of 17 pages that were all unresponsive to the March 4, 2020 request. Scoville Decl. ¶ 53.

56.     On January 13, 2025, Professor Scoville received a letter from State explaining that the processing of the request remains ongoing. Scoville Decl. ¶ 54.

57.     Professor Scoville has still received no records, in full or in part, that respond to his March 4, 2020 request. Scoville Decl. ¶ 55.

**State's Prolonged Non-Compliance Processing**
**Professor Scoville's August 16, 2021 Request**

58.     On August 16, 2021, Professor Scoville submitted a FOIA request (F-2021-09309) to State, seeking records containing analysis or discussion related to congressional

diplomatic communications reports submitted to Congress under various statutory provisions (22 U.S.C. § 2753(a)(4), (c)(2), (c)(3)(A), and (e)) regarding the use and transfer of defense articles from 2001 to 2020. The request included a specific set of 23 search terms. Scoville Decl. ¶ 57.

59.     On August 27, 2021, State emailed Plaintiff's counsel to recommend that Professor Scoville narrow his request because the provided search terms returned a large number of potentially responsive records, claiming the first five terms of 23 terms provided in the request generated 440,000 results. Scoville Decl. ¶ 60.

60.     On August 30, 2021, Plaintiff's counsel responded to State with a narrowed list of 14 search terms, removing two of the first five search terms, including the term "CODEL." Scoville Decl. ¶ 61.

61.     State acknowledged Professor Scoville's narrowed request on August 31, 2021. Scoville Decl. ¶ 61.

62.     On October 19, 2023, and again on October 30, 2023, Plaintiff's counsel requested updates on the processing of August 16, 2021 request, and on November 1, 2023, counsel for State responded that the request was "still being processed." Scoville Decl. ¶ 62.

63.     On November 9, 2023, State's counsel repeated the same claim State made on August 27, 2021: that the first five terms of the request, including the terms "congressional delegation" and "CODEL"—which Plaintiff had already removed from the request--generated 440,000 results. Scoville Decl. ¶ 62

64.     Professor Scoville further narrowed his request on November 20, 2023. Scoville Decl. ¶ 62.

65.     On November 4, 2024, State reported that it found approximately 60 records (comprising 1,500 pages) responsive to the August 16, 2021 FOIA request, and that many of the pages are reproductions of publicly available legislative text or draft documents that would be withheld in full. Scoville Decl. ¶ 63.

66.     On November 15, 2024, State made its first production of records responsive to Professor Scoville's August 16, 2021 FOIA request, producing 218 pages in full and 72 pages with redactions. Scoville Decl. ¶ 64.

67.     On December 13, 2024, State produced 66 pages in full and 23 pages with redactions that were responsive to Professor Scoville's August 16, 2021 FOIA request. Scoville Decl. ¶ 64

68.     Professor Scoville's August 16, 2021 FOIA request is still being processed. Scoville Decl. ¶ 67.

**State's Persistent Non-Compliance in**
**Responding to Professor Scoville's Requests**

69.     The six FOIA requests Professor Scoville submitted to State over the past decade remained pending for a minimum of one year and as long as five years before State began to provide any of the requested records. Scoville Decl. ¶ 8.

70.     Half of the FOIA requests submitted by Professor Scoville have been subject to years-long delays in processing documents after production finally began. Scoville Decl. ¶¶ 23, 30, 36.

71.     The estimated dates of completion ("EDC") that State initially provided to Professor Scoville extended from no less than 8 months after his request was submitted to as long as 3 years. Scoville Decl. ¶¶ 20, 47.

13

72.     State, in every instance, failed to meet the initial estimated date of completion it provided to Professor Scoville, and on two occasions extended its EDC multiple times during the processing of his requests, without explanation and without providing records in the interim. Scoville Decl. ¶¶ 20, 27-28.

73.     State routinely failed to take any action toward processing Professor Scoville's requests until he or his counsel had made repeated inquiries about their status. Scoville Decl. ¶¶ 26, 29, 39, 45-48, 50, 62-63; Raju Decl. ¶¶ 4-10; Raju Decl. Ex. 68, ("SCO_33486"), at 33513-522; Raju Decl. Ex. 42, October 21, 2024 Letter to C. Lynch.

**State Has Had a Pattern of**
**Prolonged Delay in FOIA Responses**

74.     State's prolonged delays in processing Professor Scoville's FOIA requests are not isolated events or extraordinary occurrences but rather are representative of State's routine, agency-wide failure to process FOIA requests within the time periods prescribed by law. State's Fiscal Year 2024 Annual Report, at 34 (Section VII.D).

75.     At the end of fiscal year 2024, requests in State's complex track had been pending for an average of 622.79 days and a median of 393 days, requests in State's simple track had been pending for an average of 377.91 days and a median of 300 days, and requests in State's expedited track had been pending for an average of 633.23 days and a median of 332 days. State's Fiscal Year 2024 Annual Report, at 34 (Section VII.D):

VII.D. PENDING REQUESTS — ALL PENDING PERFECTED REQUESTS

| Agency / Component | SIMPLE | | | COMPLEX | | | EXPEDITED PROCESSING | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number Pending | Median Number of Days | Average Number of Days | Number Pending | Median Number of Days | Average Number of Days | Number Pending | Median Number of Days | Average Number of Days |
| DOS – Main | 2,491 | 433 | 451.81 | 21,253 | 473 | 775.58 | 338 | 332 | 633.23 |
| OIG | 100 | 175 | 304 | 49 | 313 | 470 | 0 | N/A | N/A |
| AGENCY OVERALL | 2,591 | 300 | 377.91 | 21,302 | 393 | 622.79 | 338 | 332 | 633.23 |

76. **State repeatedly fails to acknowledge FOIA requests within the statutory timeframe, and sometimes fails to acknowledge FOIA requests at all.** Scoville Decl. ¶¶ 26, 37-38; Leopold Decl. ¶¶ 27-28, 30-31, 33-34 (one request not acknowledged for 2 years and 9 months, another for 3 years, and another for more than 2 years); Eddington Decl. ¶ 19 (requests pending without acknowledgment since 2020 and 2022); McBride Decl. ¶¶ 12, 22, 25 (April 2014 request not acknowledged for over a year; July 2022 request not yet acknowledged); Anthony Decl. ¶ 48 (no record of acknowledgement for request that eventually led to litigation).

77. **When State does acknowledge requests and communicate with requesters, that communication is often delayed, confusing, or inconsistent.** Scoville Decl. ¶¶ 16, 21, 26, 28, 33-34, 38, 44-49, 52, 59-63; McBride Decl. ¶¶ 13, 19 (detailing nearly-4-year process throughout which State variously claimed it had mailed responsive documents, claimed an exemption, then asserted that responsive records would have been long ago destroyed); Diakun Decl. ¶¶ 12, 24 (detailing 7-month delay for State to respond to clarifying questions about documents produced); *see also* Anthony Decl. ¶¶ 27-33, 35-40 (State invoked "unusual circumstances" in response to each of 19 requests filed between October 2019 and March 2021 and has provided no substantive response or production since); Leopold Decl. ¶ 14; Eddington Decl. ¶ 19; Morisy Decl. ¶ 19; Matthews Decl. ¶ 15; Hathaway Decl. ¶¶ 15, 33.

78. **Requesters often experience long delays when trying to get State to provide an estimated date of completion for their requests, with delays of more than 3 years documented in the record.** Scoville Decl. ¶¶ 20, 26, 33, 47-48; McCraw Decl. ¶¶ 13, 21 (EDCs not provided until *Times* followed up on request more than 3 years after filing and on another request over 6 months after filing); Tobias Decl. ¶¶ 7, 12, 24 (1- to 2-year delays on 8 of 10 FOIA requests); Leopold Decl. ¶ 13 (takes months for State to reply to requests for EDCs and often never responds

at all); Morisy Decl. ¶ 18 (State has taken months to provide EDCs); Hathaway Decl. ¶¶ 17-23, 33-39, 42-43 (EDCs not provided until requester sued 4+ and 8+ months after filing);

79.     **State has failed to provide estimated dates of completion when asserting "unusual circumstances," as it is statutorily required to do.** Scoville Decl. ¶¶ 44, 59; Monaghan Decl. Ex. A n.1; McCraw Decl. ¶¶ 12, 37; Hathaway Decl. ¶¶ 16, 17, 34; Diakun Decl. ¶¶ 27-28.

80.     **Although State's initial estimated dates of completion routinely stretch months or years into the future, it regularly extends or misses them, often without explanation.** Scoville Decl. ¶¶ 20, 26-28, 33, 47; McCraw Decl. ¶ 13 (over 3-year delay to give EDC, which State missed by more than 4 years, leading to litigation); Morisy Decl. ¶¶ 18, 24, 28-29, 32 (EDCs repeatedly extended over periods ranging from 2 to 7 years, with one 2013 request still pending despite 2020 EDC); Matthews Decl. ¶ 22 (request with August 3, 2023 EDC still pending in January 2025); Tobias Decl. ¶¶ 13, 24 (still-pending requests with EDCs set for up to 4 years after filing and missed by years); Diakun Decl. ¶ 28 (EDC set for 2 years and 6 months in future); Monaghan Decl. ¶ 27 (EDC missed by more than a year, ongoing); Eddington Decl. ¶ 31; *see also* Diakun Decl. ¶ 31 (detailing 6 months during which State consistently failed to meet its court-ordered deadline to begin productions).

81.     **Those who submit FOIA requests to State regularly experience substantial delay in receiving the requested records and sometimes never receive a completed response.** Scoville Decl. ¶¶ 15, 23, 30, 36, 40, 55, 65-67; Leopold Decl. ¶ 13 ("I have over 50 requests pending with State, 46 of which have been pending for over 5 years and 22 of which have been pending for almost 10 years."); Anthony Decl. ¶¶ 13-15 (approximately 45% of American Oversight's requests to State since 2017 remain pending, including 19 requests dating back to 2018, 55 dating to 2019, and 92 dating to 2020); Morisy Decl. ¶¶ 23-25, 27-29 (ongoing delays of

more than 10 and 11 years); Sus Decl. ¶¶ 13, 18a, 18d, 18e (repeated delays of up to 5 years); Matthews Decl. ¶ 14 (ongoing 18- and 19- month delays); McBride Decl. ¶¶ 12, 17-19 (4-year delay that ended with State informing professor that it had no responsive records); Diakun Decl. ¶¶ 11, 23, 32, 35-36 (1-2 year delays for promptly litigated requests and 7-year delay for nonlitigated request); Tobias Decl. ¶¶ 12, 14, 21, 25 (ongoing, long delays for majority of journalist's 10 requests, spanning from 2.5-7 years, ongoing); Eddington Decl. ¶ 18 (delays for all 14 FOIA requests filed by think tank Senior Fellow since 2019, including 12 still pending); McCraw Decl. ¶ 14 (nearly-11-year delay to complete production of records ); Monaghan Decl. ¶ 27 (ongoing, 2-year-and-6-month delay for single, easily identifiable record); *see also* Morisy Decl. ¶ 10 (stating State's average response time for requests submitted through MuckRock platform is 512 days).

82.     **For example, the percentage of American Oversight's requests that State began processing in the same year they were filed has never exceeded 10%.** Anthony Decl. ¶ 15 (State produced records in same year request filed 1 time for 23 requests filed in 2017 [4.34%], 2 times for 68 requests filed in 2018 [2.94%], 13 times for 137 requests filed in 2019 [9.49%], 12 times for 160 requests filed in 2020 [7.5%] and zero times in each year thereafter).

83.     **State's productions, even in response to requests in litigation, are significantly delayed, constitute only partial productions, and are sometimes never completed.** Scoville Decl. ¶¶ 21, 29-30, 35, 52-57, 64-65; McCraw Decl. ¶ 24 (State reported having completed production of litigated request, but *Times* was aware of additional responsive records and challenged adequacy of search); Diakun Decl. ¶ 33 (State identified 5,000 additional records potentially responsive to litigated request after initial search was challenged); Morisy Decl. ¶¶ 31-34 (describing receipt of partial production in 2016 to a 2015 request, but nothing further);

Anthony Decl. ¶ 73 (production of only 13 responsive pages to requests submitted in 2018 and 2019 that remain pending, despite litigation).

84. **Records produced by State in response to FOIA requests are often incomplete, nonresponsive, or both, requiring challenges that further lengthen the process.** Scoville Decl. ¶¶ 17, 21, 29, 35, 39, 53, 55, 63, 65-66; Sus Decl. ¶ 16 (describing frequently incomplete, heavily redacted, or nonresponsive, productions by State "often necessitating follow-up requests, appeals, and litigation"); Diakun Decl. ¶ 33 (State identified 5,000 potentially responsive records after initial search was challenged); Tobias Decl. ¶ 15 (State's response incomplete or non-responsive); Leopold Decl. ¶ 15 (describing significant issues experienced in State productions "including a failure to search for all responsive records" and producing heavily redacted documents); Eddington Decl. ¶ 45 (describing State production consisting largely of non-responsive "notices that State is consulting with other agencies").

85. **State's FOIA processing delays are often so prolonged that requesters withdraw or close their requests because the requested records would no longer be useful by the time they were disclosed.** Anthony Decl. ¶¶ 14, 77 (115 of 414 requests by American Oversight (over 27%) were withdrawn or closed, generally because "information sought was no longer timely"); Diakun Decl. ¶¶ 35-36 (request pending 7 years withdrawn because advocacy efforts had shifted to more timely topics); Sus Decl. ¶ 18 (describing requests withdrawn because public interest substantially diminished after lengthy delays); Raju Decl. Ex. 2 ("Kootz Dep. Tr.") at 104:18-105:13 (estimating that State administratively closes approximately 95% of requests for which it sends "still interested" letters, often because "so much time has passed, [the requesters] don't need that information anymore").

86. **Scholars, journalists, and others who have used FOIA repeatedly to obtain government information report that State's FOIA delays and incomplete processing are worse than they experience at other federal agencies.** Morisy Decl. ¶¶ 9, 10 (State's average response time for 1,000+ requests submitted through MuckRock is 78% slower and it fulfills 53% fewer requests than federal agency average); Sus Decl. ¶ 15 ("State's slow FOIA processing and response times are far worse than other federal agencies"); Anthony Decl. ¶ 17 (State "among the slower" agencies in American Oversight's experience); Monaghan Decl. ¶¶ 21-24 (ACLJ assumes it will have to sue to get State to produce records, unlike other agencies).

**State's Pattern of FOIA Non Compliance Is Persistent**

87. **State's non-compliance with FOIA's disclosure deadlines has endured for more than a decade, despite purported improvement efforts.** Raju Decl. Exs. 19-29 ("State's 2014-2024 Fiscal Year FOIA Annual Reports") (Section V.A); Raju Decl. Exs. 30-37 ("State's 2016-2023 Chief FOIA Officer Reports") (Section V); Raju Decl. Ex. 4 ("Expert Report of A.Jay Wagner"), at 1; *see also* Raju Decl. Ex. 58 ("SCO_674"), at 676 (Backlog Reduction Plan created in 2020 "with the goal of eliminating its backlog so that it can keep up with new, incoming FOIA requests."); Raju Decl. Ex. 38 ("State's March 2024 Chief FOIA Officer Report"), at 18, 22 (noting that State continues to follow 2020 Backlog Reduction plan).

88.     In nine of the last eleven fiscal years since 2014, State has processed fewer requests than it received:

Table 1: FOIA Requests Received, Processed, and Pending at State, FY 2014 Through FY 2024

| Fiscal Year | FOIA Requests Received in Fiscal Year | FOIA Requests Processed in Fiscal Year | Processed Requests Identified as Duplicate in Fiscal Year | Number of Requests Pending as of End of Fiscal Year |
|---|---|---|---|---|
| 2014 | 19,696 | 18,094 | 103 | 10,974 |
| 2015 | 24,837 | 14,002 | 132 | 21,759 |
| 2016 | 27,961 | 15,482 | 60 | 24,210 |
| 2017 | 7,688 | 21,736 | 73 | 13,804 |
| 2018 | 8,448 | 10,928 | 38 | 11,292 |
| 2019 | 8,589 | 6,545 | 41 | 13,368 |
| 2020 | 9,019 | 7,041 | 103 | 14,844 |
| 2021 | 10,683 | 9,505 | 58 | 16,055 |
| 2022 | 13,864 | 9,167 | 61 | 20,981 |
| 2023 | 15,713 | 12,576 | 257 | 24,119 |
| 2024 | 22,306 | 20,775 | 3,510 | 25,451 |

**Sources:** State's Fiscal Year 2014-2024 FOIA Annual Reports (Section V.A).

89.     **The number of FOIA requests pending at State has more than doubled from 10,974 in fiscal year 2014 to an all-time high of 25,451 in fiscal year 2024.** State's Fiscal Year 2014 FOIA Annual Report, at 16 (Section V.A); State's Fiscal Year 2024 FOIA Annual Report, at 18 (Section V.A).

90.     **The number of processed requests identified as duplicate in FY 2024, 3,510 requests, is thirteen times higher than in any of the previous ten fiscal years.** *See supra* Table 1. State's Fiscal Years 2014-2024 FOIA Annual Reports (Section V.B.(1)).

91.     **During the period encompassing fiscal years 2014 through 2024: the average age of pending FOIA requests in State's simple track exceeded 260 days every year; the average age of pending requests in the complex track increased from 510 days in 2014 to**

**622.79 days in 2024; and the average age of pending requests in the expedited track increased from 332.5 days in 2014 to 633.23 days in 2024:**

Table 2: Average Age, in Days, of State's Pending Simple, Complex, and Expedited FOIA Requests, FY 2014 Through FY 2024

| Fiscal Year | Simple (avg number of days) | Complex (avg number of days) | Expedited (avg number of days) |
|---|---|---|---|
| 2014 | 370 | 510 | 332.5 |
| 2015 | 265.03 | 552.18 | 169.28 |
| 2016 | 583.91 | 653.33 | 351.74 |
| 2017 | 492.51 | 652.37 | 346.21 |
| 2018 | 697 | 673.93 | 616 |
| 2019 | 605.42 | 626.46 | 718.73 |
| 2020 | 427 | 805 | 622 |
| 2021 | 260 | 631 | 550 |
| 2022 | 400 | 780 | 700 |
| 2023 | 512 | 991 | 791 |
| 2024 | 377.91 | 622.79 | 633.23 |

**Source:** State's Fiscal Years 2014-2024 FOIA Annual Reports (Section VII.D)

92. **During the period encompassing fiscal years 2014 through 2024: The average time that FOIA requests on State's simple track at the end of the fiscal year remained unprocessed was as long as 697 days, and never fewer than 260 days; the average time that FOIA requests on State's complex track remained unprocessed was as long as 991 days, and never fewer than 510 days; and, the time that FOIA requests on State's expedited track remained unprocessed was as long as 791 days, and never fewer than 169.28 days.**

Source: *supra* Table 2.

93. **During the period encompassing fiscal years 2014 through 2024: the average time for State to close requests in the "simple" category that were processed in a particular year exceeded 30 days in ten out of eleven years; the average time to close "complex" requests was never lower than 115 days and climbed to 564 days for requests processed in fiscal year 2024; and, the average time to close requests in the "expedited" category increased from 386**

**days for requests processed in fiscal year 2014 to an all-time high of 530 days for requests**

**processed in fiscal year 2024:**

Table 3: Average Number of Days Required for State to Process Simple, Complex, and Expedited FOIA Requests, FY 2014 Through FY 2024

| Fiscal Year | Simple (avg number of days to close) | Complex (avg number of days to close) | Expedited (avg number of days to close) |
|---|---|---|---|
| 2014 | 90 | 535 | 386 |
| 2015 | 111 | 511 | 102 |
| 2016 | 342 | 517 | 139 |
| 2017 | 290 | 650 | 416 |
| 2018 | 409 | 461 | 436 |
| 2019 | 75 | 171 | 479 |
| 2020 | 87 | 350 | 399 |
| 2021 | 80 | 267 | 464 |
| 2022 | 40 | 115 | 200 |
| 2023 | 150 | 161 | 350 |
| 2024 | 17 | 564 | 530 |

**Sources:** State's Fiscal Years 2014-2024 FOIA Annual Reports (Section VII.A)

94.     **During the period encompassing fiscal years 2014 through 2024: the average response time for processed "simple" requests, when records were disclosed, was as high as 395.29 days and exceeded 60 days in every year; the average response time for processed "complex" requests, when records were disclosed, was as high as 678.56 days and exceeded 100 days in ten out of eleven years; and, the average response time for processed "expedited" requests, when records were disclosed, was as long as 596.87 days and exceeded 165 days in ten out of eleven years.**

Table 4: Average Number of Days Required for State to Process Simple, Complex, and
Expedited FOIA Requests for Which Information Was Granted, FY 2014 Through FY 2024

| Fiscal Year | Simple (average number of days) | Complex (average number of days) | Expedited (average number of days) |
|---|---|---|---|
| 2014 | 120 | 578.8 | 396.7 |
| 2015 | 165 | 589 | 40 |
| 2016 | 276 | 562 | 165 |
| 2017 | 371.63 | 678.56 | 454.32 |
| 2018 | 395.29 | 491.09 | 406.89 |
| 2019 | 80.42 | 234.97 | 484.25 |
| 2020 | 276.77 | 379 | 596.87 |
| 2021 | 180 | 203 | 400 |
| 2022 | 174 | 64 | 200 |
| 2023 | 200 | 100.87 | 350.14 |
| 2024 | 60.04 | 188.93 | 323.31 |

**Sources:** State's Fiscal Years 2014-2024 FOIA Annual Reports (Section VII.B)

95.     **State's FOIA backlog has exceeded 10,000 requests every year since 2014.** Data

Appendix III to the Expert Report of A.Jay Wagner, at 3; State's Fiscal Years 2014-2024 FOIA

Annual Reports (Section XII.A) (confirming that State's annual backlog reached its lowest point

in the last ten years in 2014 with a backlog of 10,045 requests).

Table 5: Number of Backlogged Requests at the End of the Fiscal Year, FY 2014 Through FY 2024

| Fiscal Year | Number of Backlogged Requests |
|---|---|
| 2014 | 10,045 |
| 2015 | 20,626 |
| 2016 | 22,664 |
| 2017 | 13,021 |
| 2018 | 10,400 |
| 2019 | 11,106 |
| 2020 | 13,798 |
| 2021 | 14,941 |
| 2022 | 18,765 |
| 2023 | 21,619 |
| 2024 | 21,615 |
| 2025 (Q1) | 23,095* |

**Sources:** State's Fiscal Years 2014-2024 FOIA Annual Reports (Section XII.A), State's Quarterly FOIA Report: Quarter 1 FY 2025. *As of end of First Quarter for fiscal year 2025.

96.     **State's FOIA backlog in FY 2023 and FY 2024 is nearly double what it was when State announced its backlog reduction plan in 2020.** Expert Report of A.Jay Wagner, at 15 ("As of fiscal year 2023, the number of backlogged requests is nearly double what it was when the State Department announced the backlog plan."); State's Fiscal Years 2020-2024 FOIA Annual Reports (Section XII.A).

97.     **State has made no reasonable progress in reducing its backlog.** *See supra* Table 5; Data Appendix III to the Expert Report of A.Jay Wagner, at 3; State's Fiscal Year 2020 FOIA Annual Report (Section XII.A) (illustrating the agency's backlog was 13,798 requests in FY 2020); State's Fiscal Year 2023 FOIA Annual Report, at 45 (Section XII.A) (illustrating the agency's backlog reached 21,619 requests in FY 2023); State's Fiscal Year 2024 FOIA Annual Report, at 42 (Section XII.A) (illustrating the agency's backlog reached 21,615 requests in FY 2024); State's

Quarterly FOIA Report: Quarter 1 FY 2025 (reporting the backlog as of the end of the first quarter for Fiscal Year 2025 was 23,095).

**98.     The age of State's oldest pending perfected request has increased steadily and significantly, from approximately 8 years old in 2014 to approximately 17 years old at the end of FY 2024.**

Table 6: Oldest Pending FOIA Requests, FY 2014 Through FY 2024

| FY | | Tenth-oldest request | Oldest request |
|---|---|---|---|
| 2014 | Date received | 5/10/2006 | 2/14/2006 |
| | Number of days pending | 2184 | 2244 |
| 2015 | Date received | 8/4/2006 | 4/2/2006 |
| | Number of days pending | 2382 | 2471 |
| 2016 | Date received | 10/10/2006 | 6/27/2006 |
| | Number of days pending | 2508 | 2580 |
| 2017 | Date received | 2/7/2007 | 6/8/2006 |
| | Number of days pending | 2672 | 2774 |
| 2018 | Date received | 4/12/2007 | 10/10/2006 |
| | Number of days pending | 2883 | 3009 |
| 2019 | Date received | 4/25/2007 | 10/10/2006 |
| | Number of days pending | 3119 | 3254 |
| 2020 | Date received | 5/3/2007 | 11/26/2006 |
| | Number of days pending | 3366 | 3475 |
| 2021 | Date received | 5/29/2007 | 11/27/2006 |
| | Number of days pending | 3601 | 3727 |
| 2022 | Date received | 5/8/2007 | 11/26/2006 |
| | Number of days pending | 3843 | 3954 |
| 2023 | Date received | 8/14/2007 | 1/2/2007 |
| | Number of days pending | 4023 | 4178 |
| 2024 | Date received | 1/30/2008 | 8/24/2007 |
| | Number of days pending | 4183 | 4289 |

**Sources:** State's Fiscal Years 2014-2024 FOIA Annual Reports (Section VII.E)

99.    Data on 1,051 FOIA requests submitted to State since 2010 using the MuckRock platform show that as of January 31, 2025, only 129 requests (~12%) had received complete responses, 106 requests (10%) had been rejected, 81 requests (~8%) were found to have no responsive documents, and the rest remained outstanding. Morisy Decl. ¶ 9.

100.    State regularly cites its persistently high backlog of pending FOIA requests as justification for extending the estimated date of completion for FOIA requests. Scoville Decl. ¶ 28; Morisy Decl. ¶¶ 24, 28 ("State repeatedly identified its backlog of requests as a reason that it was postponing the estimated date of completion" for requests pending since April 2013 and December 2014); Anthony Decl. ¶¶ 27, 28, 49, 55 n.13, 64, 68, 69, 70 (State claimed delay to complete requests filed in November 2018, March 2019, June 2019, July 2019, August/September 2019, October 2019, and November 2019 would "depend on the number of other requests ahead of [the requests] in the relevant processing track"); McCraw Decl. ¶ 17; Diakun Decl. ¶ 28; Tobias Decl. ¶¶ 20, 23.

101.    State has told at least one requester that a 2.5-year estimated date of completion was based on its FOIA backlog and not on the content of the request, so no alternate processing schedule could be developed. Diakun Decl. ¶ 29.

102.    State's prolonged delays in FOIA compliance are so pervasive and persistent that some requesters assume they will need to file a lawsuit to receive records in any reasonable time. Sus Decl. ¶ 17 ("In CREW's experience, litigation is the only avenue for obtaining records from State through FOIA without waiting several years, and, even then, production will be delayed significantly beyond FOIA's statutory deadlines"); Monaghan Decl. ¶¶ 21, 23 (State has never produced records in response to an ACLJ request without ACLJ filing suit); Anthony Decl. ¶¶ 26, 44; McCraw Decl. ¶ 36; Leopold Decl. ¶ 15; Eddington Decl. ¶ 21; *see*

*also* Anthony Decl. ¶ 60 (State granted expedited processing for four requests but produced no records until American Oversight filed suit); Eddington Decl. ¶ 37 (State reported finding no responsive records, despite clear evidence from another FOIA lawsuit that responsive records existed, causing Cato to file suit); McCraw Decl. ¶ 24 (similar but *Times* had already sued over contested request).

**State's Pattern of FOIA Non-Compliance Is Pervasive**

103. **State routinely fails to comply with FOIA's disclosure deadlines regardless of the type of requester, impeding scholarship, investigative reporting, and other projects of public interest.** Scoville Decl. ¶¶ 69-70, 73; Hathaway Decl. ¶ 43 (delays led scholar to publish research article while still awaiting additional information and hindered "ability to fully advise Congress" regarding proposed federal law); Matthews Decl. ¶¶ 12, 23, 29 (delays forced scholar to "shut down" portions of his research, reducing his "ability to engage in career-advancing research," "build [his] personal research portfolio, and engage in public scholarship"); McBride Decl. ¶ 6 (delays hindered scholar's ability to publish on time and harmed chances of tenure); McCraw Decl. ¶¶ 15, 26 (records regarding alleged war crimes in Afghanistan and Hunter Biden's laptop received by journalists after years of delay deprive the public of news that timely response would expose); Leopold Decl. ¶ 20 (State's ongoing, 11-year delay in producing records interfered with journalist's ability to report about Guantanamo Bay); Tobias Decl. ¶¶ 31-32 (prolonged delays prevent journalist from reporting timely on matters of public concern and affect "the quality and accuracy" of reporting); Eddington Decl. ¶¶ 22-24, 47 (delays caused think tank fellow to delay forthcoming book and hindered ability to raise public awareness of timely issues); Morisy Decl. ¶¶ 7, 26, 30, 36 (delays as long as 11 years hindered MuckRock's ability to conduct investigations, produce reports, and inform the public on matters of public interest, including the Guantanamo Bay detention center and handing of Hillary Clinton's email); Diakun Decl. ¶¶ 7, 14,

34 (prolonged wait times "hinder the Knight Institute's ability to craft effective and timely advocacy strategies, to ensure accountability for government actions, and to advance public awareness of government policies and programmatic decisions" that "often implicate core civil rights and liberties of the public"); Sus Decl. ¶ 19 ("State's FOIA processing delays have disrupted, and will continue to disrupt, CREW's ability to timely disseminate important information to the public).

104. **Individuals or organizations with a variety of missions and interests that have filed multiple FOIA requests with State have experienced protracted, years-long delay in obtaining records.** Scoville Decl. ¶¶ 15, 18, 23, 30, 36, 40, 55, 65, 67; Morisy Decl. ¶¶ 12, 18, 22 (describing delays in 17 requests submitted to State by MuckRock founder between 2011 and 2017); Sus Decl. ¶¶ 7, 13 (delays in 55 FOIA requests submitted by CREW since 2014); Anthony Decl. ¶¶ 11, 13-14, 15 (delays in vast majority of 414 requests to State by American Oversight); McBride Decl. ¶¶ 7, 12 (delays in 3 FOIA requests and 2 MDR requests to State since 2013); Diakun Decl. ¶¶ 8, 11 (delays in 9 FOIA requests to State by Knight Institute since 2017); Tobias Decl. ¶¶ 7, 12, 14 (delays in 8 of 10 FOIA requests to State since 2018); Leopold Decl. ¶¶ 8, 17 (delays regarding "nearly every single [one]" of hundreds of requests to State since 2011); Eddington Decl. ¶¶ 11, 18 (delays in 14 FOIA requests to State since 2019); Monaghan Decl. ¶¶ 9, 10, 21, Ex. A (delays in 35 requests to State since 2016).

105. **State routinely fails to comply with FOIA's disclosure deadlines regardless of the topic or subject matter of the request.** Scoville Decl. ¶¶ 10, 14; Anthony Decl. ¶¶ 18-43, 76 (delays in requests regarding events of January 6, 2021, the COVID-19 pandemic, the Giuliani-Ukraine investigation, and "2020 suspension of employment-based visas potentially impacting hundreds of thousands of foreign workers"); Morisy Decl. ¶¶ 23, 27, 31 (delays in requests relating

to Sony film *The Interview*, rent payments for Guantanamo Bay Naval Base, and Hillary Clinton's email account); Eddington Decl. ¶ 13 (delays in requests relating to American citizen detained abroad, intellectual property theft by China, domestic surveillance of Arab and Muslim Americans, State's compliance with foreign aid vetting laws, and more); Hathaway Decl. ¶¶ 10, 27 (delays in requests related to nonbinding international agreements entered by State); Diakun Decl. ¶ 9; Tobias Decl. ¶ 9; McBride Decl. ¶ 9; Leopold Decl. ¶ 9; Sus Decl. ¶¶ 8-9; McCraw Decl. ¶ 9.

106. **State routinely fails to comply with FOIA's disclosure deadlines regardless of the level of detail provided in describing the records sought, the potential complexity of the search required, or the volume of responsive records.** Scoville Decl. ¶¶ 15, 18, 23, 30, 36, 40, 55, 65, 67; Tobias Decl. ¶¶ 10, 12 (delays experienced despite specific identification of records and key words for search); Monaghan Decl. ¶¶ 14, 21 (delays in FOIA requests varying from "smaller requests targeting specific documents by name to larger requests seeking a more substantial volume of documents"); Sus Decl. ¶¶ 9, 13 (typical delays of 1 to 4 years for requests requiring production of varying volumes); Matthews Decl. ¶¶ 10, 14 (ongoing delays for requests related to specific historical events implicating large volume of files); Eddington Decl. ¶¶ 30-31, 36-38, 43-45 (ongoing delays for requests both broad and narrow).

107. **State regularly fails to respond within FOIA's disclosure deadlines even when a request is narrow and targeted.** Scoville Decl. ¶¶ 31, 42; Monaghan Decl. ¶ 27 (failure to respond to 2021 request for single, readily-identifiable document that State subsequently posted online without informing the requester or closing still-pending FOIA request); McBride Decl. ¶¶ 21-23 (1+ year delay for State to inform requester it had no responsive visa records for one specific person and 3-year delay to confirm as much on appeal); Leopold Decl. ¶¶ 27-29 (still-pending request from 2018 seeking a single set of specific flashcards); Anthony Decl. ¶ 29 (5 still-

pending 2020 requests seeking communications with a specific person or on a specific day); Tobias Decl. ¶¶ 22-25 (still-pending 2018 request for records sent or received by one individual containing two specific terms); Eddington Decl. ¶¶ 14-15 (ongoing delay in receiving responsive records to request that provided specific "to/from data, serial numbers and dates" of diplomatic cables sought).

108. **State's failure to comply with FOIA's disclosure deadlines is so pervasive that some journalists, scholars, and advocacy organizations have stopped pursuing investigations or research avenues that would require seeking records from State.** McBride Decl. ¶ 15 (delays, miscommunications, and frustrations caused historian to abandon avenues of research that would require requesting records from State); Diakun Decl. ¶ 37 (Knight Institute often foregoes FOIA requests to State due to extensive delays and need to litigate to obtain records); Matthews Decl. ¶¶ 16, 24 (State FOIA non-compliance prevented Scholar from pursuing research project); Anthony Decl. ¶¶ 14, 77 (State FOIA non-compliance caused American Oversight to withdraw "dozens of requests to State when the salience of the records at issue diminished due to the passage of time"); McCraw Decl. ¶ 34 (State's delays often lead *Times* reporters to go forward with stories without important records or to forego stories that would have arisen from produced records).

109. **State has recently closed a large number of requests by sending "still interested" letters that inform those with long-pending requests that their request will be closed "administratively" unless they respond within 30 days and affirm a continuing interest in receiving the requested records.** Kootz Dep. Tr. 104:13-17; 106:9-13; 108:8-110:2 (sometime near the end of fiscal year 2023, State reversed its policy against sending "still interested" letters, which State's expert estimated to result in administrative closures for 95% of

requests for which they are sent); Eddington Decl. ¶ 38; Anthony Decl. ¶ 22; Sus Decl. ¶ 18a; Diakun Decl. ¶ 35; Morisy Decl. ¶ 34; Leopold Decl. ¶ 14.

110. **State does not prioritize responding to those requests that are reaffirmed following a "still interested" letter.** Kootz Dep. Tr. 104:13-17 (when a requester reaffirms their interest in requested records, State "just keep[s] their case open and continue[s] on"); *see also* Anthony Decl. ¶¶ 22-24 (no follow-up from State in the 7+ months since American Oversight reaffirmed interest); Sus Decl. ¶ 18a (no follow-up from State in 4+ months since CREW reaffirmed interest); Eddington Decl. ¶ 38 (no follow-up from State in 5+ months since Cato Institute reaffirmed interest).

111. **Requests closed "administratively" after a requester fails to respond to a "still interested" letter count as being both "withdrawn" and "processed" for the purposes of State's annual FOIA reports.** Kootz Dep. Tr. 311:15-312:17 (noting that requests closed after State sends a "still interested" letter are "withdrawn" and "processed," and that State listed 4,452 requests "withdrawn" in its 2024 FOIA annual report).

**State's Practices Regarding Litigation**
**Contribute to Its Persistent Backlog**

112. **State informs FOIA requesters that they may not administratively appeal its failure to respond by the statutory deadline, but notes that requesters can instead initiate a lawsuit in federal court.** Scoville Decl. ¶ 49; McCraw Decl. ¶ 35.

113. **Those who have repeatedly submitted FOIA requests to State report that delays are particularly lengthy when they do not bring litigation to compel FOIA compliance.** Diakun Decl. ¶¶ 11, 23, 32, 35-36 (1-2 year delays for promptly litigated requests and 7-year delay for nonlitigated request); Sus Decl. ¶ 13; *see also* McCraw Decl. ¶¶ 36, 39; Leopold Decl. ¶ 15; Monaghan Decl. ¶ 21.

**114. After experiencing lengthy delays, some FOIA requesters initiate litigation to obtain State's records, requiring them to invest additional time, effort, and resources to obtain records they are entitled to receive by law.** Scoville Decl. ¶¶ 18, 22, 29, 34, 39, 41, 50; McCraw Decl. ¶ 39; Sus Decl. ¶ 17; Anthony Decl. ¶¶ 44, 78; Diakun Decl. ¶ 11; Leopold Decl. ¶ 36; Eddington Decl. ¶¶ 21-22; Monaghan Decl. ¶ 22; Hathaway Decl. ¶¶ 21-23, 38-39; *see also* Raju Decl. Ex. 43, SCO_2626 (FOIA complaint brought by *New York Times*); Raju Decl. Ex. 44, SCO_6399 (FOIA complaint brought by ACLJ); Raju Decl. Ex. 45, SCO_7659 (FOIA complaint brought by American Oversight); Raju Decl. Ex. 46, SCO_9299 (FOIA complaint brought by CREW); Raju Decl. Ex. 47, SCO_9658 (FOIA complaint brought by Eddington); Raju Decl. Ex. 49, SCO_10611 (FOIA complaint brought by Hathaway); Raju Decl. Ex. 50, SCO_11817 (FOIA complaint brought by Knight Institute); Raju Decl. Ex. 51, SCO_12437 (FOIA complaint brought by Leopold); Raju Decl. Ex. 48, SCO_12437 (FOIA complaint brought by Muckrock).

**115. State's failure to respond to FOIA requests within the statutory time limits is the most common claim advanced in FOIA litigation filed against State.** Kootz Dep. Tr. 304:09-13 (State's expert testifying that the most common cause of FOIA litigation filed against State is "[n]ot responding to the requests within the statutory time limits"); State's March 2024 Chief FOIA Officer Report, at 3 ("Most litigation cases are filed against the Department for failure to respond within the statutory time limits"); Raju Decl. Ex. 70, SCO_14234, at 14238 (explaining State's inability to timely process FOIA requests causes significant increase in FOIA litigation).

**116. The primary burden to State from FOIA litigation is processing the underlying FOIA request.** Kootz Dep. Tr. at 306:06-12 (State's expert confirming that "the primary burden [in FOIA Litigation] is producing the records responsive to the FOIA request" and that in litigation State can actually "narrow [the] scope and change the confines of a FOIA

request"); Raju Decl. Ex. 60, SCO_706 ("IPS is responsible for processing the underlying request(s), including conducting searches, reviewing documents for relevance to the request, and processing relevant documents for release.").

117.    **State prioritizes the processing of FOIA requests that are in active litigation over all other requests.** SCO_414 (listing "Litigation" as top priority, followed by "Litigation Referrals from Other Agencies," "Expedited Requests," Expedited Referrals," "Appeals," and the last priority listed is "All other cases – First In, First Out" including "Direct requests to the Department"); Raju Decl. Ex. 1 ("Stein Dep. Tr.") at 88:15-90:12 (explaining that "yes, litigation tends to be a top priority" "because there are court-driven deadlines or other requirements to comply with court orders"); Stein Dep. Tr. at 90:04-90:08 (State prioritizes the processing of FOIA requests that are in active litigation over all other requests because it is required to comply with court orders.); Stein Dep. Tr. at 92:15-93:03; Raju Decl. Ex. 57, SCO_657, at 658 (listing "Litigation Cases" as first priority for FOIA processing); SCO_674 (explaining that State redirects "agency resources from non-litigation to litigation in response to court orders").

118.    **State's practice of deprioritizing the processing of FOIA requests that are not subject to active litigation results in additional FOIA litigation.** Stein Dep. Tr. at 266:13-268:01 ("[W]hen you commit your resources in one area, something else is not getting done."); Stein Dep. Tr. at 268:17-269:07 (testifying that a focus on processing requests in litigation "would be a variable and a factor" in the rise of new FOIA litigation); Kootz Dep. Tr. 200:02-05 ("If there was much lower demand signal coming from our FOIA litigation arm," State could "divert those resources to FOIA case processing"); *see also* State's March 2024 Chief FOIA Officer Report, at 3 (FOIA requests in litigation "demand a disproportionate share—approximately 90%—of the FOIA reviewer resources, which has contributed to the increase in the FOIA backlog").

119.    **The FOIA resources that State dedicates to litigation each year are predictable and consistently high.** Kootz Dep. Tr. 309:01-12 (agreeing that new FOIA litigation has been "relatively consistent" between 2021 and 2023); SCO_674, at 677 ("This plan accounts for the number of new FOIA litigation cases that are expected this year given the past few years; given those numbers, the Department will likely receive 50-60 new litigation cases in FY 2020.").

Table 7:  Number of New FOIA Lawsuits Filed Against State, Requests Received, and State's Assessment of Resources Dedicated to FOIA Litigation for Fiscal Years 2016 through 2023

| Fiscal Year | New Litigation Filed in Fiscal Year | FOIA Requests Received in Fiscal Year | State's assessment for percent of FOIA review resources dedicated to litigation |
| --- | --- | --- | --- |
| 2016 | 57 | 27,961 | 80% |
| 2017 | 53 | 7,688 | 70-80% |
| 2018 | 75 | 8,448 | >80% |
| 2019 | 86 | 8,589 | >90% |
| 2020 | 84 | 9,019 | >90% |
| 2021 | 54 | 10,683 | Not reported |
| 2022 | 56 | 13,864 | 90% |
| 2023 | 56 | 15,713 | 90% |

**Sources:** Raju Decl. Ex. 59, SCO_688, at 694; State's Fiscal Years 2016-2023 FOIA Annual Reports (Section V.A); State's 2017-2024 Chief FOIA Officer Reports.

120.    **State's effort to create separate branches to handle FOIA litigation has not succeeded in reducing the burden of FOIA litigation on State's resources.** SCO_674, at 675 (State's 2020 Backlog Reduction Plan explaining State will "maintain[] distinct resources for both FOIA and FOIA litigation demands," "the Department is positioned for the first time in a few years to maintain separate resources for the FOIA and FOIA litigation program," and "[p]ermission to fill key FOIA vacancies will allow for dedicated resources in each program and should mitigate against the need to shift FOIA resources to litigation cases"); Stein Dep. Tr. at 134:19-135:09 (testifying that in 2016 "most of our ability to review records was in litigation, not on the other

parts of the FOIA process, and so [the 2020 Backlog Reduction] plan here sought to balance that out so we could do both concurrently without having to sacrifice one for the other"); Stein Dep. Tr. at 93:09-94:19 (State has "four FOIA litigation branches. . . . [W]e have more resources committed to litigation now."); Stein Dep. Tr. 131:22-132:14; Stein Dep Tr. 264:09-14 (acknowledging that "it is very possible" that there may be a need to have employees in FOIA processing "assist with FOIA litigation"); Stein Dep. Tr. 284:14-20 (admitting that review resources are still being stretched from case processing to litigation); State's March 2020 Chief FOIA Officer Report, at 16 (representing that "the Department's plan provides for distinct resources for both FOIA and FOIA litigation demands" and the "Department has been given permission to fill key FOIA vacancies that will allow for dedicated resources in each program and will mitigate against the need to shift resources from FOIA to FOIA litigation cases").

121.    **State has continued to claim that FOIA litigation demands 90% of State's FOIA review resources.** Kootz Dep. Tr. 315:22-316:04 (testifying that the "long-standing figure" for the percent of review resources that FOIA litigation demands "is approximately 90 percent"); State's March 2024 Chief FOIA Officer Report, at 3 (FOIA requests in litigation "demand a disproportionate share—approximately 90%—of the FOIA reviewer resources, which has contributed to the increase in the FOIA backlog"); State's March 2020 Chief FOIA Officer Report, at 3 (FOIA litigation demands "90% of [State's] FOIA review resources"); *see also* State's March 2017 Chief FOIA Officer Report, at 2 (FOIA Litigation demands "80% of [State's] FOIA resources"); SCO_14421, at 14421 ("FOIA litigation cases continue to absorb most of the available FOIA review resources.").

122.    **The Freedom of Information Act, 5 U.S.C. § 552(a)(6)(C), authorizes a court to stay FOIA litigation to allow an agency extended time to respond to a FOIA request where**

**"exceptional circumstances" are the cause of the delay and the agency is exercising due diligence in responding to the request, but State has not been granted nor sought such a stay since 2005.** Raju Decl. ¶¶ 11-16.

**State's Implausible and Unsuccessful**
**2020 Backlog Reduction Plan**

123. **In early 2020, State finalized a Backlog Reduction Plan that was purportedly designed to eliminate State's backlog of FOIA requests by Fiscal Year 2027 and keep pace with the timely processing of new incoming requests.** SCO_674, at 676 (stating, in 2020 Backlog Reduction Plan, that State had developed the plan to "allow[] for compliance with FOIA litigation demands and concurrent progress in reducing its FOIA backlog" and that the plan "sets an annual monthly closure rate target for FOIA cases with the goal of eliminating its backlog so that it can keep up with new, incoming FOIA requests"); Stein Dep. Tr. 122:07-15 (confirming SCO_674 accurately represents State's 2020 Backlog Reduction Plan); Kootz Dep. Tr. 157:15-158:02 (same); Kootz Dep. Tr. 164:22-165:03 (confirming "the 2020 backlog reduction plan expressly claimed its goal was for State to eliminate its backlog"); State's March 2020 Chief FOIA Officer Report, at 16 ("[T]he Department estimates that it will be able to eliminate its FOIA backlog by FY 2027."). State's March 2024 Chief FOIA Officer Report, at 18, 22 (noting the Attorney General's 2022 FOIA Guidelines instruct agencies "to reduce FOIA processing backlogs,'" explaining that "[t]he Department has developed a multi-year plan that allows for compliance with its increasing FOIA litigation demands while making concurrent progress in reducing its FOIA backlog," and the "plan provides for distinct resources for both FOIA and FOIA litigation demands and sets an annual monthly closure rate target for FOIA requests with the goal of eliminating the backlog while keeping up with new, incoming FOIA requests").

124.     **State created its 2020 Backlog Reduction Plan in response to a request from the Government Accountability Office ("GAO").** Raju Decl. Ex. 69, SCO_13772 (reflecting that the 2020 Backlog Reduction Plan was approved in response to a GAO recommendation explaining that the plan was used to set processing targets for Bureau-level strategy); Stein Dep. Tr. 123:01-10 ("So this document was drafted for—for two reasons. There was a GAO, Government Accountability, request for a backlog reduction plan, so we wanted to comply with the request from the GAO, which is, of course, a legislative branch agency. Concurrently, we were already thinking about what metrics and milestones we needed to balance out FOIA litigation demands and FOIA case processing demands.").

125.     **State did not perform any "formal assessments" of its 2020 Backlog Reduction Plan, due in part to the cost and time required.** Stein Dep. Tr. 128:17-19.

126.     **State built its 2020 Backlog Reduction Plan on the obviously incorrect assumption that over the next seven years it would receive no more than 8,100 FOIA requests each year, fewer requests than it had received in the prior two years and far fewer than the average number of requests over the previous five years.** SCO_674, at 678 (listing "8100" for "New Cases in FY" for fiscal years 2020, 2021, 2022, 2023, 2024, 2025, 2026, 2027); Stein Dep. Tr. 353:20-354:01 (confirming that assumption that State would receive only 8,100 requests each year "is not correct"); Stein Dep. Tr. 156:20-157:10 ("[W]e averaged out a few years of the past and to the best of our ability to make a reasonable prediction of what we could be facing in the future. It appeared that those predictions were somewhat accurate, at least for 2020. We had 8,747 new cases according to your chart. But we were incorrect in 2021, '22, '23, with increase upticks of 10,000, 13,000, 15,000 new FOIA requests, which is why I think, as a responsible senior leader, I've asked another senior leader to develop an update to this plan so we could better manage this

program."); Stein Dep. Tr. 354:16-20 ("I mentioned we are updating [the backlog reduction plan] for the very reason you just pointed out, that we are receiving more requests, and that's a big challenge, which was not—not anticipated at the time of drafting this plan."); Stein Dep. Tr. 355:05-18 (confirming State "decided to assign a static number to the new cases that State would receive" and that State realized that the "static prediction was incorrect" and the "8,100 figure is now low, so it needs to be revisited").

**127.    The number of requests State receives per year has historically trended upwards.** Expert Report of A.Jay Wagner, at 14 ("While annual requests received fluctuate over time . . . they historically trend upwards."); Expert Report of A.Jay Wagner, at 14 fig.8 (showing an upward trend in requests received from FY 1998 to FY 2023); Kootz Dep. Tr. 125:21-126:14 (confirming that "for requests received, going back from 2008 to 2023" the general trend "would be an upward trend" in the number of requests received."); Kootz Dep. Tr. 118:12-17 (confirming that "[t]he department has seen a steady increase in the number of FOIA requests received year-over-year during the period 2019 to 2024").

**128.    When it adopted the 2020 Backlog Reduction Plan, State was aware that the Plan's projections for the number of new FOIA requests received each year were inaccurate.** Raju Decl. Ex. 71, SCO_30146, at 30146-47 (February 28, 2020 email from head of State's FOIA program, explaining that State expected to receive 9,300 FOIA requests in 2020, acknowledging that that projection is higher than the number of requests received in the year prior, and explaining that projections for future incoming requests should be considered in projecting future backlogs and the resources need reduce the backlog).

**129.    State did not—and still has not—updated its 2020 plan.** Stein Dep. Tr. 147:10-15 (regarding the 2020 Backlog Reduction Plan, testifying that "[n]othing's been generated since

this document, so what's in place here stands. However, I have asked for updates to this plan given that we received more than 12,000 requests last year, so the overall plan needs to be adjusted accordingly"); Stein Dep. Tr. 126:22-127:06 (confirming the 2020 Backlog Reduction Plan "is the only one" that is "a written plan" and "was finalized and approved by a chief FOIA officer"); Stein Dep. Tr. 288:02-10 (confirming a new backlog reduction plan has not yet been drafted); State's March 2024 Chief FOIA Officer Report, at 18, 22 (noting that State "continues to follow" its 2020 Backlog Reduction Plan, and that "[t]he plan is being reviewed and is expected to be updated in FY 2024").

130. **Many of State's cited reasons for failing to update the Backlog Reduction Plan were within its own control.** Kootz Dep. Tr. 185:12-187:18 (explaining that State had not updated the 2020 Backlog Plan because (1) State was waiting to hire a new IPS Director until March 2023, (2) State had chosen to move its FOIA processing operations to Charleston, (3) Kootz was waiting for modifications to the FOIA reporting dashboard, (4) State had restructured its operations such that "IPS [was] being changed to IAP," (5) Kootz needed to familiarize himself with "all the different nuances that occur working in a disbursed federal agency," and (6) the COVID-19 pandemic interfered with planning); Stein Dep. Tr. 383:02-05 (noting that the IPS Director "position was vacant from November '21—2021 to March 2023").

131. **State has relied on the unrealistic 2020 Backlog Reduction Plan to guide its case closure targets and set anticipated resource needs.** SCO_674, at 675 ("The Department's FOIA Backlog reduction plan is based on two key principles: (1) maintaining distinct resources for both FOIA and FOIA litigation demands and (2) establishing monthly closure rate targets that stretch the program annually until it reaches a monthly case closure rate of 1,000 cases per month. . . . For the second principle, the Department assessed its current and projected case processing. The

Department has taken proactive steps to acquire resources to support such a plan. To achieve annually increasing targets, the Department is increasing its number of full-time FOIA employees by filling vacancies and adding new full-time contract positions"); SCO_674, at 676 ("This plan sets an annual monthly closure rate target for FOIA cases with the goal of eliminating its backlog so that it can keep up with new, incoming FOIA requests."); SCO_674, at 677 ("Also provided below is a chart that depicts the target monthly closure rates for the FOIA program to reduce the backlog."); SCO_674, at 677 ("The chart takes into account existing human resources and projected new employees (government, contractor, and part-time) over the next several years based on current human resources and funding levels."); Kootz Dep. Tr. 143:05-145:06 (explaining that estimated closure targets are important factor in determining what resources State should request and deploy).

132. **Given the unrealistic assumptions in the 2020 Backlog Reduction Plan, State's backlog of FOIA requests has continued to grow even though it has been able to meet the processing goals set in the plan.** Stein Dep. Tr. 359:19-360:01 (confirming that "even though State has met its case closure targets, for example, in 2023, it exceeded its case closure targets, the backlog has still continued to grow"); *see also supra* Table 5.

133. **State acknowledges that an effective backlog reduction plan would minimize the number of pending and backlogged requests while, at the same time, providing for timely processing of new incoming requests.** Stein Dep. Tr. 154:17-22 ("I've asked Tim as IPS director to update and come up with a new planning strategy that at a minimum keeps up with the volume of incoming requests and ultimately seeks to do what this plan sought to do and minimizing any pending cases or backlogs."); Stein Dep. Tr. 218:08-17 ("I have asked Tim Kootz as the director of IPS to come up with new plans moving forward and to build upon—to update the current plan

that we developed and—or that I developed that we went through previously, and that is how we're going to approach trying to improve our FOIA case processing numbers so we can keep up with the volume of incoming requests and ultimately start reducing our pending cases and backlog.").

134. **Instead of updating the 2020 Backlog Reduction Plan, State has updated its goals such that it is no longer planning its "day forward" efforts with the aim of eliminating the backlog.** Kootz Dep. Tr. 170:15-171:04 (confirming that backlog elimination is not contemplated in the timeframe from deposition "day forward"); *see also* Kootz Dep. Tr. 177:20-178:21 (answering "I do not foresee that in the near future" when asked for "a timeframe for which it would be reasonable to endeavor to eliminate the backlog"); Kootz Dep. Tr. 196:09-14 (confirming that the goal of the 2020 Backlog Reduction Plan was to eliminate the backlog).

**State's Rejection of Practices That Reduced**
**Its Backlog and Improved Response Times**

135. **Beginning in Fall 2017, State initiated an effort known as the FOIA Surge backlog reduction project (the "Surge") to increase its FOIA processing capabilities, better comply with FOIA, and eliminate the backlog of pending FOIA requests by December 2017.** Raju Decl. Ex. 52 ("SCO_200") (then-Secretary Rex Tillerson acknowledging that "the Department currently sits on a significant backlog of FOIA requests stretching back almost a decade" and "committing more resources and workforce to address this backlog"); Stein Dep. Tr. 167:10-12, 168:16-20 (estimating that the FOIA Surge initiative began around August or September 2017); Stein Dep. Tr. 169:06-12 ("The Secretary issued a directive saying that [State] needed to eliminate [its]—and reduce [its] FOIA backlog and do better with case processing, so I believe the intent was to better comply with the FOIA law."); Kootz Dep. Tr. 165:10-17 ("Under Secretary Tillerson I believe there was a FOIA surge where there were additional internal resources dedicated to the FOIA program."); Raju Decl. Ex. 62 ("SCO_13774"), at 13776 (October 2017

document identifying the goal of the Surge effort and explaining "[t]he Secretary has directed the Department to eliminate its FOIA backlog of approximately 13,000 cases by the end of December 2017"); Stein Dep. Tr. 171:10-172:18 (explaining that additional resources obtained for the Surge "better positioned [State] for success" in order to "clear the backlog within those three months"); SCO 14421, at 14421 ("At the start of calendar year 2017, the backlog was as high as 24,000 cases; it has been reduced by about 42% to about 14,000 cases."); Raju Decl. Ex. 54 ("SCO_401"), at 401 (document summarizing updates from Eric Stein regarding State's Surge efforts and stating "Eric emphasized that our goal is to comply with the law and eliminate the backlog"); Raju Decl. Ex. 64 ("SCO_13906"), at 13913 (Fiscal Year 2017 appropriations summary, stating "The Bureau of Administration's allocations continues its enhanced responsiveness to Freedom of Information Act (FOIA) requests and Congressional inquiries through increased funding for the FOIA program activities"); Raju Decl. Ex. 65 ("SCO_13940"), at 13949 (Fiscal Year 2018 operating plan for enduring funds, stating "The Bureau of Administration's allocation includes $33.9 million for compliance with the Freedom of Information Act, including $7.8 million previously notified in CN 17-247 to reduce the significant backlog of more than 13,000 requests").

136. **State's FOIA Surge required a change in processing policies to advance its goal of eliminating the backlogged FOIA requests.** Stein Dep. Tr. 110:01-09 (testifying that during the Surge "hundreds of additional employees [were] assigned to work in FOIA. And the result of that initiative was approximately a 40 percent reduction of the backlog"); Stein Dep. Tr. 115:05-07 ("The FOIA surge effort was helpful in reducing cases that were pending in the Department . . . ."); Stein Dep. Tr. 178:04-17 ("[T]he [Surge] process was very similar [to pre-surge processing]. It was just broken apart in the surge into additional steps that allowed us to really focus on parts of the FOIA process that don't get dedicated resources all the time."); Stein

Dep. Tr. 115:18-116:08 (during the Surge, State implemented a system to track the time spent to process FOIA requests and used that data "to make some really informed decisions, at least with regard to where do we want to strategically put resources moving forward").

137. **During the Surge, State increased the number of staff and the resources available to process FOIA requests.** Stein Dep. Tr. 110:18-21 ("IPS has about 400 employees, and we had hundreds of additional employees working with us in the FOIA process during the FOIA surge."); Stein Dep. Tr. 169:13-170:14 (testifying that the additional resources allocated to State's FOIA program during the Surge included "additional human resources, new technology, and additional funding as well. The human resources included unassigned foreign service officers who could be between assignments. . . . [T]here were dozens if not hundreds of additional employees who were working within the bureaus to work on the FOIA surge as well"); SCO_13774, at 13786 ("To support this effort, the Department has identified hundreds of existing human resources to participate."); Raju Decl. Ex. 53, SCO_376, at 376 ("The Secretary has directed the Department to reduce its FOIA backlog by the end of December 2017. The Department is dedicating internal resources for the next 90 days to A/GIS/IPS (FOIA office) to meet this deadline . . . ."); Raju Decl. Ex. 66 ("SCO_14418"), at 14418 (summary of Surge that took place from September 2017 to April 30, 2018, explaining that State "trained and engaged more than 600 Department employee who actively worked on over 13,000 backlogged cases," "28,000 hours were spent searching records and over 13,000 hours spent redacting records"); Raju Decl. Ex. 63, SCO_13870, at 13871 ("The Department currently has a significant backlog of FOIA requests dating back a decade with over 13,000 requests outstanding. Accordingly, the Department is committing additional resources to address the backlog. The A Bureau allocation reflects an increase of $7.8 million to support a FOIA workforce surge . . . .").

**138.    During the Surge, State made significant progress in reducing the number of backlogged requests and time to process new requests.** Stein Dep. Tr. 110:07-14 (testifying "the result of [the Surge] initiative was approximately a 40 percent reduction of the backlog"); SCO_14418, at 14418-19 (during the Surge—from September 2017 to April 30, 2018—State "closed over 5,000 backlogged cases that existed at the start of the Surge, about a 40 percent reduction of the backlog. . . . While at the start of the Surge in September we had around 13,000 backlogged cases, and we closed over 5,000 of those backlogged cases, the Department received over 4,400 new FOIA requests during the Surge time period. When you account for all FOIA cases closed during the Surge time period, the Department closed over 7,000 cases, which includes both the 5,000 backlogged cases that existed in September and 2,000 of the new cases as well"); SCO_401, at 401 (highlighting "36 or 37%" reduction in backlog, and as of January 25, 2018 "our overall backlog, including incoming cases, has continued its downward trend to 10,600 cases. The backlog of 13,000 cases measured this past September is now down to 8300"); SCO_674, at 676 ("The approach of setting monthly case closure targets has worked in recent years to reduce the FOIA backlog . . . . In FY 2017, the Department set a goal of closing 900 FOIA cases per month. By the end of FY 2017, the Department closed cases at a rate of about 1,800 cases per month.").

**139.    In fiscal year 2018, State discontinued the Surge efforts and reduced funding below the level it knew would be needed to continue processing FOIA requests at the pace of the Surge.** Raju Decl. Ex. 56, SCO_617 (noting that the funding to retain certain employees "during the Surge comes to an end in September 2018"); Stein Dep. Tr. 217:05-22 (testifying that the funding allocated to IPS for the Surge was not renewed for the Fiscal Year after then end of the Surge).

**State's Failure to Maintain Sufficient**
**Funding or Staff for FOIA Compliance**

140. **State's budget resource request process requires it to anticipate future and additional resource needs of the FOIA program based on the number of cases it is receiving and closing**. Raju Decl. Ex. 17, ("State's Supplemental Responses to Plaintiff's Interrogatory Nos. 29 and 31"), State's Response to Interrogatory No. 29 (State's budget is created by "generating a preliminary budget resource request ("BRR") at the bureau or office level based on an assessment of what resources are needed to continue the FOIA program at its current operating levels, including staff and technology costs. Additional initiatives and expansions of current programs are then also considered and potentially incorporated. . . . The BRR process requires the FOIA program to consider current and future resource needs for the current FY, and for the following two fiscal years. FOIA resources being requested in BRRs are driven by the contemporary and anticipated needs of the FOIA program at that moment in time, including current caseloads, litigation demands, or technology requirements. Data concerning the FOIA program, such as the number of new cases received and cases closed, helps to inform the strategic decisionmaking process regarding the deployment of any existing or additional financial resources to hire additional personnel, further invest in technology, or cover other known expenses such as FOIA litigation settlement fees.").

141. **State does not have sufficient funding to satisfy its FOIA obligations.** State's Supplemental Responses to Plaintiff's Interrogatory Nos. 29 and 31, State's Response to Interrogatory No. 31 ("The Department's FOIA program is faced with a multitude of challenges that require resourcing above current allocations to meet the requirements of the FOIA.").

142. **State has not requested additional funding sufficient to satisfy its FOIA obligations.** Raju Decl. Ex. 18, State's Supplemental Response to Interrogatory No. 11, 12, and

28, Response to Interrogatory No. 28 ("Neither the State Department nor individual Department components have submitted requests for FOIA funding outside of the annual budget request process or existing Department processes to repurpose Department funds, including through congressional notification procedures, during the period March 10, 2016, to the present.") Kootz Dep. Tr. 152:15-153:09 (when asked if IPS submitted a budget request to the Bureau of Budget and Planning for additional FOIA funding, State's expert testified that "the department has been operating on a base budget since approximately fiscal year '18. So base budget increase requests often aren't entertained, so we would submit an IT central fund requests for enhancements to pay for the maintenance or development costs of our eRecords archives and FOIAXpress. Those are often commonly requested items. I believe in the last round there was a request for additional resources for a non-FOIA-related program . . . .").

**143.    From fiscal years 2014 to 2024, the number of full-time FOIA staff at State has fluctuated from 127 to 267, but has not kept up with increases in number of requests:**

Table 8: Staffing Numbers and Requests Received/Processed for Fiscal Years 2014 through 2024

| Fiscal Year | Number of "Full-Time FOIA Employees" | Number of "Equivalent Full-Time FOIA Employees" | Total Number of "Full-Time FOIA Staff" | FOIA Requests Received | FOIA Requests Processed | FOIA Requests Received per each "Full Time FOIA Staff"* |
|---|---|---|---|---|---|---|
| 2014 | 64.5 | 62.59 | 127.09 | 19,696 | 18,094 | 154.98 |
| 2015 | 82 | 87.75 | 169.75 | 24,837 | 14,002 | 146.32 |
| 2016 | 76 | 54.46 | 130.46 | 27,961 | 15,482 | 214.33 |
| 2017 | 207.4 | 59.75 | 267.15 | 7,688 | 21,736 | 28.78 |
| 2018 | 213.28 | 62.32 | 275.6 | 8,448 | 10,928 | 30.65 |
| 2019 | 141 | 66.68 | 207.68 | 8,589 | 6,545 | 41.36 |
| 2020 | 110 | 95.97 | 205.97 | 9,019 | 7,041 | 43.79 |
| 2021 | 112 | 71.2 | 183.2 | 10,683 | 9,505 | 58.31 |
| 2022 | 67 | 59 | 126 | 13,864 | 9,167 | 110.03 |
| 2023 | 181 | 86.86 | 267.86 | 15,713 | 12,576 | 59.33 |
| 2024 | 142 | 122 | 264 | 22,306 | 20,775 | 84.49 |

**Sources:** State's Fiscal Year 2014-2024 FOIA Annual Reports (Sections IX, XII.D.(1))
*Calculated by dividing number of FOIA requests received for each fiscal year by the total number of "Full-Time FOIA Staff"

**144.    State's staffing shortcomings have repeatedly impeded its ability to timely respond to FOIA requests and make progress in reducing its backlog.** SCO_14421, at 14421 (August 2017 overview of FOIA program, noting that "[a]t least 15 of the Department's 23 best FOIA reviewers are no longer with the Department. This means that the Department reviews about 4,500 fewer pages each month than when these reviewers were here"); SCO_14421, at 14422 (explaining that "there will still be a shortage of resources to meet the demands of the FOIA program's effort to reduce the backlog by September 2019 and meet its FOIA litigation needs" and noting unfilled "civil servant vacancies, including a critical leadership position for a FOIA

litigation branch chief"); SCO_674, at 675 ("[T]he Department is positioned for the first time in a few years to maintain separate resources for the FOIA and FOIA litigation program. Permission to fill key FOIA vacancies will allow for dedicated resources in each program and should mitigate against the need to shift FOIA resources to litigation cases."); Kootz Dep. Tr. 160:17-161:04, 297:04-18 (explaining that contract employees such as those hired to support the 2020 Backlog Reduction Plan are not authorized to make "inherently governmental decisions" and must have their work reviewed by government employees); Stein Dep. Tr. 78:19-79:11 (explaining that "since [FOIA processing is] an inherently governmental function, some sort of government oversight would ultimately make the decision on what—how to handle and process that case, not the contract employee").

**145. Beginning in 2022, State moved its FOIA case processing operations to Charleston, S.C., which resulted in the loss of the majority of its FOIA processing staff and further exacerbated State's violations of FOIA timing deadlines.** Raju Decl. Ex. 61, SCO_13401, at 13401 (noting "Relocation of Case Processing Operations to Charleston, SC" was "[a]nnounced in March 2022"); State's March 2023 Chief FOIA Officer Report, at 4 ("In March 2022, the Department announced that it was moving the majority of its FOIA case processing operations from Washington, DC to Charleston, SC, beginning in the summer of 2022 with all affected personnel to be in Charleston by the end of 2024."); State's March 2023 Chief FOIA Officer Report, at 13 (admitting the move to Charleston impacted the FOIA program "as the majority of the affected FOIA employees chose not to move to Charleston and either transferred to other positions in the Department's records and information access programs (including to FOIA litigation) or left the Department"); Stein Dep. Tr. 370:02-22 (confirming "over 50 percent of FOIA staff" "either transferred to other positions within IPS or left the Department"); State's

March 2023 Chief FOIA Officer Report, at 25 ("This increase in the number of incoming requests, coupled with a decrease in FOIA staffing numbers, contributed to the increase in the FOIA backlog. The reduction in FOIA staff was primarily a result of the Department's decision to transfer the majority of the FOIA case processing operations to Charleston, SC."); State's March 2024 Chief FOIA Officer Report, at 10.

Dated: February 18, 2025

Respectfully submitted,

 /s/ Tobin Raju
Tobin Raju
Morgan Baker[*]
Rick Da*
Andrea DenHoed*
Noah Kim*
Ben Menke*
Anna Selbrede*
MEDIA FREEDOM &
  INFORMATION ACCESS CLINIC
YALE LAW SCHOOL[†]
127 Wall Street
New Haven, CT 06520
(203) 436-5836
tobin.raju@ylsclinics.org

Hunter Van Asten
GODFREY & KAHN, S.C.
State Bar No. 1131631
833 E Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
(414)-273-3500
hvanasten@gklaw.com

*Counsel for Plaintiff*

---

[*] Law student authorized under Local Rule 84.

[†] This document does not purport to offer the institutional views of Yale Law School, if any. Clinical Fellow Stacy Livingston was integral to the research, drafting, and editing of this document.