# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

---------------------------------:
RYAN SCOVILLE, :
:
Plaintiff, :
: Case No.
vs. : 2:22-cv-00091-NJ
:
U.S. DEPARTMENT OF STATE, :
:
Defendant. :
---------------------------------:

DEPOSITION OF ERIC STEIN

DATE: Friday, April 12, 2024
TIME: 9:32 a.m.
LOCATION: Ballard Spahr LLP
1909 K Street, Northwest
Washington, D.C. 20006

REPORTED BY: Erick M. Thacker
Reporter, Notary

Veritext Legal Solutions
1250 Eye Street, NW, Suite 901
Washington, D.C. 20005

A P P E A R A N C E S

On behalf of Plaintiff:

TOBIN RAJU, ESQUIRE
DORRIN AKBARI
ARJUN MALIK
Media Freedom & Information Access Clinic
Yale Law School
P.O. Box 208215
New Haven, Connecticut 06520
tobin.raju@ylsclinics.org

On behalf of Defendant:

CHRISTOPHER M. LYNCH, ESQUIRE
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20005
christopher.m.lynch@usdoj.gov

- and -

LILIA LOPEZ, ESQUIRE
U.S. Department of State
2201 C Street, Northwest
Washington, D.C. 20451

ALSO PRESENT:

Noah Kim (Via telephone)

Dave Schultz (Via telephone)

C O N T E N T S


| EXAMINATION BY: | PAGE |
|---|---|
| Ms. Akbari | 9 |
| Mr. Malik | 107 |
| Ms. Akbari | 223 |
| Mr. Malik | 324 |
| Ms. Akbari | 368 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Deposition-1 | Notice of Deposition | 12 |
| Deposition-2 | SCO_688 - SCO_696 | 20 |
| Deposition-3 | State's Chief FOIA Officer Report - March 2024 | 282 |
| Deposition-4 | SCO_674 - SCO_678 | 122 |
| Deposition-5 | Litigation, FOIA, and Backlog Requests Chart | 149 |
| Deposition-6 | SCO_672 - SCO_674 | -- |
| Deposition-7 | SCO_13774 - SCO_13796 | 170 |
| Deposition-8 | SCO_367 - SCO_369 | 182 |
| Deposition-9 | SCO_376 - SCO_381 | 189 |
| Deposition-10 | SCO_560 | -- |
| Deposition-11 | SCO_623 | 191 |
| Deposition-12 | SCO_394 | 193 |

C O N T E N T S (Continued)

E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Deposition-13 | SCO_14433 | -- |
| Deposition-14 | SCO_313 | 206 |
| Deposition-15 | SCO_344 - SCO_346 | 211 |
| Deposition-16 | State's Chief FOIA Officer Report - March 2018 | -- |
| Deposition-17 | SCO_701 - SCO_703 | -- |
| Deposition-18 | FOIA Backlog Reports Graph | 231 |
| Deposition-19 | State's Chief FOIA Officer Report - March 2017 | 239 |
| Deposition-20 | SCO_14421 - SCO_14422 | 244 |
| Deposition-21 | SCO_414 | 88 |
| Deposition-22 | SCO_1929 - SCO_1937 | 270 |
| Deposition-24 | State's Chief FOIA Officer Report - March 2020 | -- |
| Deposition-25 | Consolidated Date Graphs | -- |
| Deposition-26 | SCO_320 - SCO_321 | -- |
| Deposition-27 | SCO_2104 - SCO_2106 | -- |
| Deposition-28 | SCO_1996 - SCO_1997 | 274 |
| Deposition-29 | SCO_1999 - SCO_2002 | 277 |
| Deposition-30 | FOIA Annual Report Statistics | 360 |

C O N T E N T S (Continued)

E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Deposition-31 | AI News Article | -- |
| Deposition-32 | State's Chief FOIA Officer Report - March 2021 | -- |
| Deposition-33 | State's Chief FOIA Officer Report - March 2022 | -- |
| Deposition-34 | State's Chief FOIA Officer Report - March 2023 | 369 |
| Deposition-35 | SCO_2350 - SCO_2375 | 301 |
| Deposition-36 | Scoville 2020 FOIA Request Acknowledgment March 24, 2020 | 310 |
| Deposition-37 | Scoville Request EDC March 3, 2021 | -- |
| Deposition-38 | Scoville 2020 and 2021 Request Updates November 9, 2023 | 331 |
| Deposition-39 | Scoville 2021 FOIA Request Acknowledgment August 17, 2021 | 324 |
| Deposition-40 | Scoville 2021 FOIA Request Narrowing E-mail Chain | 329 |
| Deposition-41 | Excerpted Pages SCO_1882 - 1882 from SCO_1841 | -- |
| Deposition-42 | SCO_13566 - SCO_13567 | -- |
| Deposition-43 | State's Chief FOIA Officer Report - March 2 | 265 |

C O N T E N T S (Continued)

E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Deposition-44 | SCO_547 | -- |
| Deposition-45 | SCO_14454 - 14461 | 325 |
| Deposition-46 | Policies for Processing FOIA and Privacy Cases September 2019 SCO_00000939 - 942 | 307 |


(*Exhibits attached to transcript.)

as well.

Q And you noted often reviews that. So is the policy that they do not always have to review that denial?

A I think it depends on the circumstances. There are different forms of denial for records. We have sometimes something what's called -- one example is a Glomar response. I don't know how familiar you are --

Q Yeah.

A -- but where that we can neither confirm nor deny, and that can happen for a variety of reasons. It could be something very sensitive, classified. It could involve some privacy matters. So I think it depends on the circumstances around why the denial is occurring.

Q Okay. And could a contract employee be serving as an analyst?

A A contract employee can be serving as an analyst. However, since that's an inherently governmental function, some sort of government oversight would ultimately make the decision on

what -- how to handle and process that case, not the contract employee.

Q So in the case of a contract employee, all of their denials would be reviewed by an individual within State?

A Depending on -- the work of a contract employee would -- has oversight by a government employee, so depending on the circumstances surrounding the case, of the actual denial, that denial would go out under signature from a government official, not a contractor.

Q Okay. Now moving away from this chart, of all of the FOIA requests that are received by State, are there certain types or categories of records that are most frequently requested, for example, individual visa records, passport records, public oversight requests?

A There is not a majority request, but there are categories of records requested frequently. Consular records are frequently requested, visa and passport records and requests, and then, otherwise, the requests

MS. AKBARI: Sure.
THE WITNESS: EDCs are available upon request. I just have to check with -- I believe you can check an EDC setting in FOIAXpress, and it might even be included in our standard template letters that go out as well. But it depends on the nature of the request, and that's why I paused.
BY MS. AKBARI
Q And does State currently have a policy in place with the goal of improving, meaning shortening, the estimated dates of completion for requests?
A No.
Q Okay. Could you please turn to Exhibit 21 in your binder?
(Deposition Exhibit Number 21 was marked for identification.)
A Yes.
Q That is a document produced by State titled "FOIA Processing Priorities," dated October 24th, 2016, with Bates 414. I'm going to

read the top portion of this document out loud.

Quote, "Below in priority order (No. 1 being top priority) is a list of how we should manage our Freedom of Information Act requests. This goes for both analysts and reviewers. No. 1, Litigation. No. 2, Litigation Referrals from Other Agencies. No. 3, Expedited Requests. No. 4, Expedited Referrals. No. 5, Appeals. No. 6, All other cases -- First In, First Out. This includes the following: Direct requests to the Department, Referrals from other agencies (complying with deadlines), Consultations and Other."

When was this processing priorities list adopted?

MR. LYNCH: Objection. Vague as to adopted. You can answer.

THE WITNESS: The document's dated October 24th, 2016, so at least upon the issuance of the -- the document to FOIA employees, which would have been on or around October 24th, 2016.

BY MS. AKBARI

Q Is this order of priorities still in place today?

A There have been several changes to the FOIA program since 2016, so, generally speaking, litigation tends to be a top priority because there are court-driven deadlines or other requirements to comply with court orders. So at a high level, yes, litigation tends to be a top priority. Expedited requests, we talked about the queues before, and then -- and then all other cases.

I just want to point out on this document in particular, litigation, expedited requests, expedited referrals, all those different categories that are listed here was meant to provide guidance for a shared pool of reviewers in particular. It was for all employees, but the review work that was being completed and how it was being completed at this time would sometimes result in the same reviewers of documents, which I'll refer to as reviewers

prioritization of FOIA processing? Who is responsible for creating this priority list?

MR. LYNCH: Objection. Compound.

BY MS. AKBARI

Q You can feel free to answer the revised question. So who is responsible for creating this priorities list?

MR. LYNCH: This list at this time?

MS. AKBARI: Yes.

THE WITNESS: The IPS director.

MS. AKBARI: Okay.

THE WITNESS: Or whoever was serving in that capacity.

BY MS. AKBARI

Q Now I'm going to ask you to walk me through the reasoning behind each priority. You've already addressed why litigation was placed at the top, but what does it mean for litigation to be the top priority?

So by way of example, would it mean that a request that is subject to litigation needs to be processed before any other requests?

A Yes, depending on the deadlines. So for the -- are we just focused on litigation?
Q Yes.
A Okay. Thank you. For litigation, there are court-driven deadlines, and I think to understand this list better, you have to look at what was going on at that moment in time. 2016 --
Q So pausing there, let's focus on current policies. So what would it mean for litigation currently to be prioritized, so not asking about this list, but generally using this list as a guide.
So litigation being in the top, what does it mean to prioritize litigation today?
A It's different today --
Q Okay.
A -- because --
Q How so?
A -- we have -- we now have a division chief who has four FOIA litigation branches; whereas, back here, we had one FOIA litigation

branch, back here being 2016.

Q And when did those four branches come into place?

A Between 2022 and now.

Q Okay. And so what does it mean for those litigation requests to be prioritized in the context of these branches now being in place?

MR. LYNCH: Objection to the extent it mischaracterizes prior testimony.

You can answer.

THE WITNESS: It's almost irrelevant because we have more resources committed to litigation now, and so they work and manage to meet those deadlines; whereas, at the time this document was created, the resources were shared and pooled, and so setting priorities and prioritization was more of a requirement to make sure we didn't miss deadlines and did our best to comply with them.

BY MS. AKBARI

Q So given the creation of these four branches, are individuals that are responding to

As we enter 2017, we had the FOIA surge initiative, which was directed by the Secretary of State at the time, and that effort resulted in an entirely new FOIA process that was established. There was 11 steps in that process, hundreds of additional employees assigned to work in FOIA. And the result of that initiative was approximately a 40 percent reduction of the backlog -- purposely using backlog here -- of the 13,000 or so cases that were pending at the end of whatever was reported that previous fiscal year, and we saw moving it from like 13,000 to about 10,000 cases as a result of that full fiscal year.

After that, the Department looked at a review of its internal processes and procedures based on lessons learned from the FOIA surge with an organization off -- IPS has about 400 employees, and we had hundreds of additional employees working with us in the FOIA process during the FOIA surge. There were a lot of lessons learned, especially with so many

mean by progress. And if you're looking in volume of cases processed, the USCIS solution really helped to process and solve a problem that was leading to large volumes of cases.

The FOIA surge effort was helpful in reducing cases that were pending in the Department for -- the FOIA surge initiative resulted in several key lessons learned, but also results. Cases were moving, including simple cases, simple and complex.

The simple cases got closed, leaving us with a lot of complex cases, and in those complex cases, one of the results was that we were able to conduct searches for the majority of them -- I don't remember the exact metric -- but getting those cases tasked out and having, I remember, millions of records sent to us back to review.

And we had developed a dashboard for the FOIA surge effort to show us how much time was being spent on search, how much time was being spent, and while it was not an automated system, so subject to some flaws and skewed data,

you had a general idea of how long a search might take for a case and different components, how long -- and each of those different steps of the process where a case could be. And with that data, we were able to make some really informed decisions, at least with regard to where do we want to strategically put resources moving forward, where are bottlenecks in the process.

For example, we are commonly -- I don't want to say frequently or overwhelmingly, but we are -- when the Department is sued in a FOIA -- FOIA -- for FOIA, it's often timeliness of response and adequacy of search. So search was a challenge in general, let alone the proliferation of electronic data and information that needs to be sought and searched in the different systems.

And we realized we needed a better standard, a way to standardize not just the search process, but how can we use the tools we have. So we're able to leverage the eRecords archive to let -- not only search bureaus, but as we send taskers to bureaus that have to search

given time is just trying to find new ways to develop, process and use technology or other tools to -- and innovation, too, to find ways to work on -- on these problems and case processing, problems being the challenge in processing large volumes of requests and so forth.

Q So I want to have you turn to Exhibit 4, if you will.

(Deposition Exhibit Number 4 was marked for identification.)

A Yes.

Q So does this document accurately set forth State's backlog reduction plan that was in place as of February 2020?

A Yes.

Q And is this the plan that is still in place today?

A The plan is being revisited today.

Q Can you describe what is being revisited?

A Yes.

Q Please describe what's being revisited.

A So this document was drafted for -- for two reasons. There was a GAO, Government Accountability, request for a backlog reduction plan, so we wanted to comply with the request from the GAO, which is, of course, a legislative branch agency.

Concurrently, we were already thinking about what metrics and milestones we needed to balance out FOIA litigation demands and FOIA case processing demands.

Since this time, we have added additional branches to FOIA litigation, as I previously mentioned, so in some ways, this plan continues to endure in that we balanced out -- we're balancing out our FOIA case processing resources and FOIA litigation resources.

In others -- this document was released in February 2020. It's in March of 2020 that the pandemic was acknowledged, but it was already underway by this time, of course. And so as you go to the last page of the plan, you see that we had targets for cases closed -- the term

A lot of -- it really depends on the leadership structure and the preferences of management at the time. The chief FOIA officer's ultimately accountable for the FOIA program, but that -- those responsibilities of like prioritization and overseeing operations is often delegated down to the appropriate level to make sure the direction is clear and there are plans.

BY MR. MALIK

Q So just to be really clear, so since this plan was put in place, no other updated plan has been modified by the chief FOIA officer, correct?

A The chief FOIA officer has changed a few times since then, too.

Q Any chief FOIA officer.

MR. LYNCH: So you're meaning specifically a written plan, not necessarily processes or --

BY MR. MALIK

Q This plan.

A To my knowledge, this is the only

backlog reduction plan that was finalized and approved by a chief FOIA officer. The chief FOIA officer may have said we have plans or are working on different ways to improve, but a written plan, this is the only one of which -- that I recall.

Q And were there any updates to this plan that were approved by anyone below the chief FOIA officer?

MR. LYNCH: Objection. Vague to the extent that this is a question of whether -- changes to a document or changes to things that have happened.

THE WITNESS: I think the overall plan, keeping up with FOIA litigation and working to reduce the overall pending cases, remains the same. There may have been different actions taken to implement kind of the vision and strategy here, but change to the overall plan, I'm not -- not that I recall.

BY MR. MALIK

Q Is there any documentation reflecting

those changes to implementation?

A There are documents showing different actions that are planned or being taken, again, kind of in support of the overall effort to stabilize litigation and improve our FOIA case processing abilities.

Q What are those documents?

A I believe training materials. You can -- we discuss the different efforts in our chief FOIA officer report. I can't think of any other at this time.

Q Okay. And has State conducted any assessments of this backlog reduction plan since it's been implemented?

MR. LYNCH: Vague as to assessments. You can answer.

THE WITNESS: I monitor it as the IPS director and with our management team, but in terms of formal assessments, no. Those are often expensive or time-consuming and -- and we did monitor our progress against the different milestones even during the pandemic.

from the National Capital Region, the D.C. area, down to Charleston, but not changing this substantively. So I was try to think through if there's anything else that comes to mind, but --

BY MR. MALIK

Q In that production order that you mentioned, that specific case, is that the FOIA action brought by Open Society Justice Initiative? Is that what you're referring to?

MR. LYNCH: Objection. The specific cases are outside the scope, and if anything involves talking to attorneys, obviously don't answer that.

THE WITNESS: I don't recall the plaintiff. I recall the topic, though.

BY MS. AKBARI

Q And is -- is that particular production order -- is that still in place today, or has it been completed?

A I believe it had been completed.

Q So you discussed that litigation

demands have put a strain on -- on State's ability to process FOIA requests.

What steps have been taken since this plan has been put in place to address those litigation demands?

MR. LYNCH: Objection. Mischaracterizes. And you're just -- you're talking about since this plan?

MS. AKBARI: Nodding.

THE WITNESS: Several actions. The Department created three additional FOIA litigation branches, and with additional people, you have additional ability to process cases to meet demands.

The demands of FOIA litigation require people to work long hours, burnout culture, hard to recruit in general for FOIA, let alone for FOIA litigation, to say, work on FOIA and work on FOIA plus. So by creating those additional branches, it -- it sought to and I believe has created some relief in that you can better balance out the caseloads among additional

to taxpayers and trying to recruit and build up a team concurrently in Charleston as we also work creating these additional FOIA litigation branches.

What ended up happening was, the FOIA employees who did not want to move to Charleston ended -- a lot of them ended up working and work now in the FOIA litigation branches, and we were able to recruit concurrently new employees in Charleston, full-time employees, contractors, students as well, by reaching out to networks, using tools like Handshake to not just reach out to those in the Charleston area, but the whole nation for -- so we were able to staff up in Charleston -- a few employees moved from Washington to Charleston -- and building out our staffing in litigation at the same time.

BY MR. MALIK

Q And to clarify, you have four litigation branches now. If litigation demands put a strain on -- on your resources, can people be moved from other branches into the litigation

branches?

A Yes, and that's actually what we were doing around the 2016 document we were looking at. That was happening so much that it was -- most of our ability to review records was in litigation, not on the other parts of the FOIA process, and so this plan here sought to balance that out so we could do both concurrently without having to sacrifice one for the other.

Q But is that still happening today, that is, moving employees from other branches into litigation?

A Not in the same way it was done in 2016, because now we have those four branches established, and they have dedicated resources in litigation.

Q What do you mean by not in the same way?

A There was one branch in 2016, and so as time progressed and new court orders would come in, we would have to create special teams, usually consisting of employees not working in

it reaches a monthly case closure rate of 1,000 cases per month, end quote.

So what -- what is the current monthly case closure target?

A I would likely go to the last page of this plan, and it would still be 1,000 cases per month.

Q So that's the current case closure target that's in place today? It's --

A Nothing's been generated since this document, so what's in place here stands. However, I have asked for updates to this plan given that we received more than 12,000 requests last year, so the overall plan needs to be adjusted accordingly.

Q Okay. And how many cases were closed in March 2024, so last month?

MR. LYNCH: Objection. I think that's probably outside the scope. But you can answer if you know.

THE WITNESS: I don't have that data front of me right now.

want to make sure that he has ownership of the FOIA programs in those areas under him, and I've asked him to revise and review and develop updates to the strategies I mentioned previously.

Q And so you previously testified that there haven't been changes to this chart.

So State's current case closure target for fiscal year 2024 is the 12,000 that is reflected in this --

MR. LYNCH: Objection.

BY MR. MALIK

Q -- chart, correct?

MR. LYNCH: Mischaracterizes. Asked and answered.

THE WITNESS: There has not been a change to this document. However, I believe I've noted I've asked Tim as IPS director to update and come up with a new planning strategy that at a minimum keeps up with the volume of incoming requests and ultimately seeks to do what this plan sought to do and minimizing any pending cases or backlogs.

target was 3,900, which sounds low, but we were working through the litigation demands.

And for 2021, we -- it looks like we exceeded our target. We were supposed to have 7,200 and -- cases closed. We closed 9,371.

For 2022, it looks like we fell a little bit short, 9,600 as a target, but we closed 9,090 according to your data. And I'd want to make sure that that's from State.gov, the reports.

MR. MALIK: Yeah.

THE WITNESS: 2023, we wanted to close 10,800 cases, and we closed 12,536 cases.

So I would make the case that we have actually been striving to adhere to this plan and exceeding it more than not, but given the points you raised about increased volume, because you go to that other column, we only anticipated receiving about 8,100 cases a year, which wasn't an arbitrary number. We averaged out a few years of the past and to the best of our ability to make a reasonable prediction of what we could be

facing in the future.

It appeared that those predictions were somewhat accurate, at least for 2020. We had 8,747 new cases according to your chart. But we were incorrect in 2021, '22 and '23, with increase upticks of 10,000, 13,000, 15,000 new FOIA requests, which is why I think, as a responsible senior leader, I've asked another senior leader to develop an update to this plan so we could better manage this program.

BY MR. MALIK

Q So I'm going to repeat the question. Given that the initial plan assumed 8,100 cases every year, why hasn't it -- why hasn't the target increased to maintain the backlog reduction targets?

MR. LYNCH: As stated in the premise of the question, asked and answered, actually, multiple times at this point.

THE WITNESS: I don't believe I have anything else to add.

include individual numerical case closure targets?

A They could. I wouldn't necessarily see all of them for all of the employees working.

MR. MALIK: Okay. I think we should break for five.

MR. LYNCH: Five? Okay.

(Recess 12:31 p.m. to 12:43 p.m.)

BY MR. MALIK

Q So, Mr. Stein, when did discussions about the FOIA surge first begin?

A 2017.

Q When in 2017?

A It's tough to say, because there were discussions -- 2017, you have a change of administration, presidential administration. You have a new secretary of state coming in. And as these transitions occur, there are questions about program areas, and different efforts of FOIA had come up after the new administration was in place.

Q Yeah. I don't need all that. Just do

you have an estimated date of when that started?

MR. LYNCH: He was answering. So you can finish.

MR. MALIK: But not the question that I had asked, so --

THE WITNESS: So as part of those --

MR. LYNCH: He was answering the question you --

THE WITNESS: -- transitions --

MR. LYNCH: -- asked.

THE WITNESS: -- they asked questions about FOIA or other matters. So FOIA came up initially with the transition, and the FOIA surge itself had -- by the summertime had become -- not the surge, but questions about what could we do to improve FOIA. And then by August, September, the surge became something -- it wasn't called the surge, but how could we improve FOIA processing. So around August, September, it looked like we were going to have an initiative.

BY MR. MALIK

Q And who were the primary

decision-makers involved in those discussions?
A The Secretary's office.
Q Who at the Secretary's office?
A I don't know ultimately who proposed it, but the directive came from the Secretary.
Q Okay. And why did State decide to develop and pursue the surge?
A The Secretary issued a directive saying that we needed to eliminate our -- and reduce our FOIA backlog and do better with case processing, so I believe the intent was to better comply with the FOIA law.
Q What additional resources were allocated to State's FOIA program during the surge?
A There were additional human resources, new technology, and additional funding as well. The human resources included unassigned foreign service officers who could be between assignments.
Sometimes you end one assignment, get ready for another one, so there was a gap period.

Or we have to quickly close an embassy or a consulate, so people have to evacuate and they don't have an assignment at the moment because they can't go back to where they're regularly working. What are called Pathway students, who are interns, they come to the Department to work, all throughout the entire Department.

So the majority of unassigned foreign service officers and an overwhelming majority of Pathway students were assigned to work in the FOIA surge under me directly. And then there were dozens if not hundreds of additional employees who were working within the bureaus to work on the FOIA surge as well.

MR. MALIK: Okay. I'm going to direct you to Exhibit 7.

(Deposition Exhibit Number 7 was marked for identification.)

BY MR. MALIK

Q This is a document titled "Freedom of Information Act Backlog Reduction Plan/Surge Effort," dated October '17, bearing Bates 13744

to 13796. And moving forward, I'm just going to refer to this as the surge plan.

MR. LYNCH: Just one thing. October 2017. You may have just said '17. If I missed that --

MR. MALIK: Oh, my apologies.

MR. LYNCH: -- it's fine, but --

MR. MALIK: Dated October 2017.

BY MR. MALIK

Q So at Bates 13776, right at the top, the surge plan states, quote, The Secretary has directed the Department to eliminate its FOIA backlog of approximately 13,000 cases by the end of December 2017, end quote.

Was this a realistic goal?

MR. LYNCH: Objection. Vague. Calls for speculation.

THE WITNESS: There was a directive from the Secretary, and we did the best we could to comply.

BY MR. MALIK

Q With the resources that State had for

FOIA processing, was it likely that State could clear the backlog within those three months?

MR. LYNCH: Objection. Vague as to the resources State had for FOIA processing and the timing.

THE WITNESS: Can you clarify?

BY MR. MALIK

Q Was it likely given the resource -- the resources the FOIA program had that you would be able to meet the Secretary's goal?

MR. LYNCH: Same objection.

THE WITNESS: Had before the surge or had after -- with the -- when the surge -- the additional resources?

BY MR. MALIK

Q Including the additional resources given.

A It better positioned us for success.

Q Okay. So at -- on the same page, below the bullet points, the surge plan notes that the Department was going to use special processes, teams and projects to achieve the Secretary's

Q We can move on and, you know, we'll reserve the right to ask for that after the deposition.

So, at Appendix 2, which is the next page, 13793, it lays out the operating procedures for the surge. And, you know, before we go through the specific steps, please broadly describe how surge processing differed from pre-surge processing.

MR. LYNCH: Objection. Assumes facts. Lack of foundation.

THE WITNESS: At a high level, the process was very similar. It was just broken apart in the surge into additional steps that allowed us to really focus on parts of the FOIA process that don't get dedicated resources all the time.

For example, a team that works on consultations and referrals with other agencies, a FOIA employee might have to do case work and do work related to referrals and consultations.

We experimented here in No. 3 with

crosswalking that data information response and so forth, because a lot of good work was done, searches, reviews, case closure and so forth.

BY MR. MALIK

Q And what happened to the additional funding that was allocated to IPS for the surge?

MR. LYNCH: Objection.

THE WITNESS: I believe it was all spent. In funding, there's base funding, which is your year-over-year funding. There's one-time money. I believe there was all one-time funding. It wasn't meant to be money that I could continuously use, which goes into the planning of what we could as well. If someone gives you one-time money, how are you going to use it? If it's ongoing, I think we would have planned a little bit differently, too.

BY MR. MALIK

Q Okay. And so that one-time funding wasn't renewed the next fiscal year?

A Not to my knowledge, not that specific funding, no.

Q Okay. And is another surge initiative or other similar effort necessary to clear a State's FOIA backlog?

MR. LYNCH: Objection. You may get into deliberations. Calls for speculation. Vague as to similar to surge.

You can go ahead.

THE WITNESS: I have asked Tim Kootz as the director of IPS to come up with new plans moving forward and to build upon -- to update the current plan that we developed and -- or that I developed that we went through previously, and that is how we're going to approach trying to improve our FOIA case processing numbers so we can keep up with the volume of incoming requests and ultimately start reducing our pending cases and backlog.

BY MR. MALIK

Q I don't think that was responsive to the question, so I'm going to ask it again.

Is another surge necessary to clear State's FOIA backlog?

employees work as long of days and -- and being able to hire concurrently separate dedicated FOIA resources who are new to FOIA, some of them, and that's -- that's -- that's just a neutral fact that some are new to FOIA, but having additional resources, having additional people committed to FOIA is very helpful for the case processing side. It should be for the future as well.

Q And given some of these potential future unpredictable challenges you've flagged, even in light these four litigation divisions, could there be a need to bring on individuals that are in FOIA processing to assist with FOIA litigation?

MR. LYNCH: Objection. Calls for speculation.

BY MS. AKBARI

Q You can answer.

A Yes, it is very possible.

Q And has that happened since -- since the creation of those branches to date?

A Not for any major initiative that would

BY MS. AKBARI

Q And this is State's 24-page chief FOIA officer report for March 2016. And if you could turn to page 18, and that's going to be on your left-hand side. So stay with me here, but the third bullet from the bottom of the report.

So here this bullet -- and I'll give you a chance to read it, but it says, quote, "During this fiscal year the Department experienced an 84 percent increase in FOIA lawsuits over those received in Fiscal Year 2014."

What at the time did State understand to be the cause of that 84 percent increase in FOIA litigation?

MR. LYNCH: Calls for speculation.

THE WITNESS: The fourth bullet notes: "To meet court-imposed production deadlines associated with the processing of former Secretary of State Hillary Clinton's e-mails, IPS reassigned IPS employees working on processing FOIA requests and FOIA litigation to working on

the HRC Project."

So as a result of the reassignment of employees from the FOIA program to the FOIA review that had occurred prior to the drafting of this report, the factors that would be related is fewer FOIA employees processing cases. FOIA cases are non-litigation given the lift of that effort, which had just come to an end immediately following -- or immediately before this report was published.

There were requests that had come into the Department related to the Secretary Clinton matter. There were several at that time that I can -- from my experience as IPS director and speaking from the Department.

And I can't account for all 84 -- 84 percent increase as to why all of them happened, but when you commit your resources in one area, something else is not getting done. These are variables and factors that we've -- I know has been discussed in the past as to why we saw potentially an increase in litigation at this

time.

BY MS. AKBARI

Q So just for clarification, is -- this variability in the area, so you're saying the focus on responding to these requests in litigation led to decrease in processing, which then led to increases in litigation? Is that --

MR. LYNCH: Objection.

BY MS. AKBARI

Q -- the chain here?

MR. LYNCH: Mischaracterizes. If you understand --

BY MS. AKBARI

Q Feel free to clarify.

A Yeah, yeah. Can you ask that again, please.

Q Yeah. So you were saying that focusing attention towards the Clinton e-mails and litigation led to less focus on the processing, which you were saying is potentially what accounted for that increase in litigation; is that --

A It would be a variable and a factor that -- also, at that time, we were -- the demand of producing for the Clinton e-mail case resulted in requests for stays and other -- or other -- I believe the request for stays or other negotiation approaches for other cases to meet that demanding request.

Q Which is what you're saying then, in turn, led to increased litigation, this --

A It could have been a major factor.

Q Okay. Any other factors, to your knowledge?

A None that haven't been covered already.

Q Okay. And did State conduct any sort of formal assessment to determine the cause of that 84 percent increase in litigation?

A After this report was issued, we did have a study from MITRE and a group called CSM that looked at the FOIA process, and they probably looked at some numbers and stats. We had discussed it --

Q Was that the study we discussed

sentence, it notes, "While FOIA requests in litigation comprise only about 1 percent of all FOIA requests at the Department, they demand a disproportionate share -- approximately 90 percent -- of the FOIA reviewer resources, which has contributed to the increase in the FOIA backlog."

So this is the 2024 report, so is this true in light of the creation of the four additional litigation branches?

A If it was in the report, it's been cleared and reviewed, so, yes, I believe it to be true.

Q Okay. And what would explain the fact that 90 percent of resources are still going to litigation despite the creation of the four additional litigation branches?

A 90 percent of FOIA reviewer resources, which are the personnel dedicated solely to FOIA review work -- and I mentioned we have analysts. We have reviewers, and we have started training the analysts to do review work as well. So the

to be the strategies that we're deploying, yes.
Q Okay. And the new revisions that will be made have yet to be implemented with respect to that 2020 plan?
A Yes, because they would need --
Q Yes.
A -- to be drafted.
Q Yes. And so they have not yet been drafted? Okay.
A To my knowledge.
Q And would you be the recipient of the draft once it is drafted?
A My position as the DAS for Global Information Services would likely receive that plan.
Q Okay. And beyond being obligated to produce documents that are responsive to the FOIA requests that are subject to the litigation, what if any additional burden does State incur as part of these litigation matters?
MR. LYNCH: Objection. Vague.
THE WITNESS: Can you repeat the

correct?

MR. LYNCH: Asked and answered.

THE WITNESS: According to this chart, and if this is consistent with the data from FOIA.state.gov, yes.

BY MR. MALIK

Q Is that consistent with your experience that in the last few years, the number of requests State received has increased year over year?

A If that's what the data shows, yes.

Q Okay. So the back -- so turning back to Exhibit 4 in that chart on Bates 678, the backlog reduction projections are based on an incorrect assumption that State would receive only 8,100 requests each year, correct?

MR. LYNCH: Objection.

THE WITNESS: No.

BY MR. MALIK

Q So your assumption that 8,100 -- that State would receive 8,100 requests each year is correct?

A That assumption is not correct.
Q Okay.
A However, the -- Exhibit 4 was finished in February 2020 and pulled from three previous fiscal years, the data, and that data is not indicated in the chart in Exhibit 5.

And if you look at the average of those fiscal years, I believe they would be approximately 8,100 cases. And we set this plan in motion without the intention of having moving targets, but to have a system of accountability and to update it accordingly.

So the plan was meant to go from FY '20 to FY '27. We are currently in FY '24. If you're constantly changing the requirements of a plan, in this case, we -- I mentioned we are updating for the very reason you just pointed out, that we are receiving more requests, and that's a big challenge, which was not -- not anticipated at the time of drafting this plan. So I'd point out, we have stuck to those other current -- those targets of cases we wanted to

close on an annual basis according to even your chart in Exhibit 5.

Q So, in column 2, the chart -- let me rephrase.

In coming up with these backlog projections, you decided to assign a static number to the new cases that State would receive, correct? That's --

A Yes.

Q -- 8,100? Okay.

And at some point, you realized that the -- this static prediction was incorrect for -- after 2020, correct?

MR. LYNCH: Objection. Asked and answered.

THE WITNESS: Yes. I think we've discussed that the 8,100 figure is now low, so it needs to be revisited, and I --

MR. MALIK: Okay.

THE WITNESS: -- asked for an updated version of a plan.

A We would -- the Department would likely have the chief FOIA officer clear off on the plan just to make sure that that oversight was in place and there was buy-in to any changes being made.

Q And just to close the loop, looking at Exhibit 5, because of the greater volume and requests coming in now being -- now rendering the chart in Exhibit 4 inaccurate, even though State has met some of its targets for processing FOIA requests, the backlog has grown from 2019 to 2023, correct?

MR. LYNCH: Object to the characterization of the chart as inaccurate, as he testified earlier. Asked and answered as to the backlog has grown.

THE WITNESS: Can you clarify?

BY MR. MALIK

Q So even though State has met its case closure targets, for example, in 2023, it exceeded its case closure targets, the backlog has still continued to grow?

A Yes.

MR. MALIK: Can we take a five-minute break?

MR. LYNCH: Sure.

(Recess 5:29 p.m. to 5:40 p.m.)

MR. MALIK: Okay. We're back on the record. And, Mr. Stein, I just have a couple more questions about budget, and I'll direct you to Exhibit 30.

(Deposition Exhibit Number 30 was marked for identification.)

BY MR. MALIK

Q So this is another consolidated table. I'm interested in particular in the column "Processing Costs," and those processing costs are -- are taken from the FOIA annual report.

And before I ask about specific changes in processing costs, could you please explain why processing costs might sort of drastically change from one fiscal year to the next?

MR. LYNCH: Objection. Vague as to drastically. You can answer.

let's read the fourth line.

So we have a sentence here that says, "The reduction in FOIA staff was primarily a result of the Department's decision to transfer the majority of the FOIA case processing operations to Charleston, SC," here being South Carolina.

"Most of the existing FOIA staff either transferred to other positions within IPS or left the Department. The Department has been actively filling and recruiting for its FOIA vacancies and has also hired additional FOIA contract support."

So what percentage of FOIA staff is "most" referring to here in this report?

A Those that would have been affected by the reassignment to -- potential reassignment to Charleston, South Carolina, those doing FOIA case processing.

Q Right. So when you say "most," does that mean a majority, so over 50 percent of FOIA staff in that case?

A As I recall, yes.

position, it wasn't my full attention, because I also had the DAS position. And then November '21 -- 2021, I became the DAS, and that position was vacant from November '21 -- 2021 to March 2023.

Q And you had mentioned that the onboarding process for Mr. Kootz took a while, so what was the gap between when he was hired versus when he officially took his position?

A Oh, I don't recall. Most of that should be publicly available through a Google search to find out when the job was posted to when he -- March is when he -- 2023 is when he started to encumber that position.

Q Okay. Great. How often are new backlog plans issued by State, backlog reduction plans?

MR. LYNCH: Asked and answered.

THE WITNESS: Yeah, the formal -- the plan that I'm aware of is the one we've covered and discussed.

There may be efforts to address