# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

-------------------------------:

RYAN SCOVILLE, :

Plaintiff, :

vs. : Case No.:

U.S. DEPARTMENT OF STATE, : 2:22-cv-00091-NJ

Defendant. :

-------------------------------:

Deposition of TIMOTHY J. KOOTZ

Washington, D.C.

Friday, January 10, 2025

9:26 a.m.

Job No. NY-7098892

Pages 1 - 319

Reported by: Robert M. Jakupciak, RPR

Deposition of TIMOTHY J. KOOTZ, held at the offices of:

Ballard Spahr, LLP
1909 K Street, N.W.
Washington, D.C.  20006

Pursuant to Notice, before Robert Michael Jakupciak, RPR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

# A P P E A R A N C E S

On behalf of the Plaintiff:

TOBIN RAJU, ESQUIRE
STACY N. LIVINGSTON, ESQUIRE
DAVID SCHULZ, ESQUIRE (Present by phone)
BRADY WILLIAMSON, ESQUIRE (Present by phone)
Yale Law School
127 Wall Street
New Haven, Connecticut 06511
(203) 436-5836
tobin.raju@yale.edu

On behalf of the Defendant:

CHRISTOPHER M. LYNCH, ESQUIRE
U.S. Department of Justice
Federal Programs Branch
1101 L Street, N.W.
Washington, D.C. 20005
(202) 353-4537
christopher.m.lynch@usdoj.gov

# A P P E A R A N C E S

Also on behalf of the Defendant:

KAREN HOPKINS, ESQUIRE
U.S. Department of State
hopkinskn@state.gov

C O N T E N T S

THE WITNESS: TIMOTHY J. KOOTZ

EXAMINATION PAGE NO.

By Mr. Raju 6

E X H I B I T S

KOOTZ EXHIBIT NUMBER PAGE NO.

1-45 Binder of Exhibits 1 through 45 9

(Exhibits attached to transcript.)

A. We proceed to close the request. But, the big but is upon appeal, we will reopen it and remand that request.

Q. How does a requester appeal the decision to withdraw the request?

A. They reach out to the FOIA Appeals Officer.

Q. After a request is withdrawn, will a requester be informed of that decision?

A. In the context of "still interested letters"?

Q. Uh-huh.

A. So what we found approximately on our "still interested letters" is about 95 percent of FOIA requesters have not provided a response back to State Department. About 5 percent respond back and we just keep their case open and continue on.

State Department's FOIA backlog consists of FOIA cases dating back to our oldest cases in the FOIA Report date back to 2007. A lot has changed from 2007 in terms of people, where they live, their contact information, and other

aspects of a FOIA case, right?

They may have been doing a research study that now so much time has passed, they don't need that information anymore, or State Department provided it through other channels, whatever the circumstance may be.

And given that our backlog spans many different years and as part of a good backlog reduction plan and strategy is to close oldest cases, we engage in "still interested letters". What we are finding is that most "still interested letters" that we send out, approximately 5 percent we actually get a response back.

Some other portion of that, I don't know the exact figure, we get no response and it may land on an address where someone no longer lives. We no longer have that administrative record of their contact or we have an administrative record but it's changed.

If you are looking at 2007, that's 18 years now. A lot has changed for many folks in 18 years, and from a resource efficiency standpoint,

that is a mechanism that we have elected to use so we aren't process a FOIA request that ultimately will go through a very complex track, require a large portion of resources to review the consultation process, and then send it to someone that no longer lives at that address. That is not a good use of taxpayer dollars from my perspective.

Q. So just to clarify, if a requester does not respond to a "still interested letter" within 30 days, it is State's practice to close that request; correct?

A. Yes.

MR. LYNCH: Objection to the extent it mischaracterizes prior testimony.

A. Yes. We will close it. But once again, if we do receive a response, we will reopen the case and continue on with it.

Q. Okay.

A. Likewise, there is an opportunity in the "still interested letter" response where it allows us to engage with the requester where we

informing the requester of that decision?

A. I would have to point you to our FOIA regulations, but I don't know the specifics of what is provided to the requester at what point in time. But when State Department takes action on a FOIA case, we do send communications to the requester.

Now, in the still interested context, we may say if you do not respond, we are closing your case within say 30 days. That is that communication. We would not send another follow-up communication after that.

Q. Okay. Can you turn to Exhibit 24, please? This is a document titled Policies For Processing Freedom of Information Act and Privacy Cases, dated October 2019. The document bears Bates stamps SCO-33747 to SCO-33751.

Turning to page bearing Bates 33750, looking at the set of bullet points above Escalation and in the penultimate bullet point there it says the department will not use, quote, "still interested letters".

Do you know why State decided to not use "still interested letters"?

A. I do not know. I want to clarify though, even though this says policies for processing Freedom of Information Act cases, this is not in the Foreign Affairs Manual, which is the official State Department policy. So this is more internal directive or guidance product produced by leadership at the time.

Q. Leadership in which division or bureau?

A. I do not know. It doesn't have a signature. But my assumption is within Global Information Services or in IPS at the time.

Q. Okay. Did State recently decide to start using "still interested letters"?

MR. LYNCH: Objection. Vague as to recently.

A. State decided under my leadership to start using "still interested letters".

Q. When did you make that decision to start using "still interested letters"?

A. I believe late fiscal year 2023 into early fiscal year '24.

Q. Does State keep, does State track -- withdrawn.

Does State log how many "still interested letters" are sent out in a particular fiscal year?

A. The FOIA case processing office director accounts for the volume of "still interested letters". I've asked him verbally for updates on the number that have been sent, roughly the magnitude of number of responses we get back from requesters versus the number of non-responses we get back and the effect on FOIA case processing operations.

So, likewise, when I meet with my, I call it the FOIA governance group, it's the FOIA directors within Information Access Programs, on a biweekly basis, we cover sometimes general strategic matters like that. Are we seeing an uptake in appeals because we are still using "still interested letters"? What is the public

Affairs, Foreign Relations information, foreign government information, intelligence community content.

So it is, because then we would need to have extremely highly skilled, high-ranking federal employees or their contractor equivalent to have them have knowledge, skills and abilities to cover all aspects.

Q. Let's turn to your Disclosure, Exhibit 1. Paragraph 11 of your Disclosure states that, quote:

"The department has seen a steady increase in the number of FOIA requests received year-over-year during the period 2019 to 2024 as shown in Graph 1 above," end quote.

Did I read that correctly?

A. Yes.

Q. And Graph 1 we previously saw in Exhibit 2, which is similar, but Exhibit 2 is the Graph 1 that is referenced in paragraph 11 of your Disclosure; correct?

A. Yes. With Exhibit 2 in your

getting longer, taller.

Q. Was there a steady increase in the number of FOIA requests received year-over-year before 2019?

A. Which one is Mr. Wagner's data appendix?

Q. Dr. Wagner's expert report is Exhibit 3, and if you want to take a look at Table 1 on page 15, maybe that is helpful.

MR. LYNCH: Perhaps on page 14, right?

A. So looking at Dr. Wagner's data, which I assume to be accurate, there is -- it appeared to be quite volatile between 2008, 2009 and 2010. And then it appears during the 2011 to 2014 timeframe it reached a pretty steady state, and then 2015, 2016 cases kind of exploded a bit at approximately 5,000 number of cases received from 2014 to 2015. But then in 2017 there was a demonstrable drop in the number of cases received.

Q. When we were looking at Exhibit 2 earlier, the graph there, you testified earlier

that if you could put a trend line over that increase, the trend would be going up. It would be an increasing trend; is that correct?

A. Yes. Based upon my -- the 2019 data and beyond, yes.

Q. And then you had just now running through some of the data for requests received, going back from 2008 to 2023, and if you were to do a similar thing, look at a trend line there, what would the general trend be?

A. A general -- I mean plotting it out over this duration with that volatility would skew the trend line, but there would be an upward trend.

Q. Do you expect State to receive more FOIA requests in 2025 than it received in fiscal 2024?

MR. LYNCH: Objection. Calls for speculation.

A. Based upon the FOIA dashboard reporting and trend analysis I have there, I anticipate we will receive approximately 30,000

more requests, but a large proportion of that may be going to the Visa operations, which then change my calculus in terms of how I'm going to help resource or help resource those units.

At the same time, having good projections through the budget resource request process, if we know we are at a maximum threshold in terms of what we can produce and we need more resources, whether it's people or technology, that gives me data to then propose, not saying it will get approved, but propose in a budget resource request enhancements to say base funding for additional staff, ask for more FTE, ask for IT central fund, funding for IT systems.

So it allows us to have a data point, but it's not the only data point that is useful in determining how best to address the increasing demand year-over-year of FOIA requests.

Q. Why do you need those projections in order to submit requests for resources?

A. Evidence-Based Decision-Making Act is a huge part of that. That was released I believe

in 2018 and that requires agencies and personnel to use -- it might be 2018. I don't recall the exact date. But it really went into effect over the past year, two years, that OPM has been training senior executives on that.

I believe there was an executive order as well on evidence-based decision-making in the Biden Administration.

Major driver for me is I attended and I'm a graduate of the Evidence-Based Decision Leadership Academy that's hosted by OPM in the Federal Institute, and I want to ground my decision-making for resources on data and evidence, not personal opinion and intuition; as well as my Masters in Strategic Studies really kind of reemphasizes good strategic planning in that space.

Q. So having as accurate as you can projections on the requests received helps inform your decisions on what level of resources to request?

A. Yeah. So requests received, what

action office is, you know, are those requests going to. Is there from an operations management perspective, is one office receiving a higher demand signal than another? Is there the opportunity -- these are the questions I often ask myself.

Is there the opportunity to reallocate resources to help another office that's facing a high demand signal? As well as just stronger data to base our annual reporting on when we discuss our Chief FOIA Officer Report, when we are discussing this with the public, with Congress, other constituents, whomever it may be, we are able to provide an accurate picture of the challenges State Department faces, as well as what we are trying to do to overcome it and where there is gaps, and where we need, whether it's our appropriators in Congress to give us more resources, whether it's internally through the budget resource request process to make a business justification as to why we need, why State Department, why the FOIA program must have

anticipated Congress would appropriate for its base funding, so it was going to have a hard time paying current State Department employees payroll.

And that comes out of central funding. So as a means to offset that, they asked bureaus, basically mandated bureaus to reduce their budget by that value so they could pay payroll throughout the remainder of the year.

Q. Do you know what, if anything, IPS submitted to the Bureau of Budget and Planning in terms of funding requests?

A. I would have to refresh my memory.

MR. LYNCH: Sorry. Vague as to when.

BY MR. RAJU:

Q. Last year. Last fiscal year, the prior budgeting round. Are you aware of what, if anything, IPS submitted to the Bureau of Budget and Planning?

A. I don't recall specifically. But generally we don't -- it's known the department has been operating on a base budget since approximately fiscal year '18.

So base budget increase requests often aren't entertained, so we would submit an IT central fund request for enhancements to pay for the maintenance or development costs of our eRecords archives and FOIAXpress. Those are often commonly requested items.

I believe in the last round there was a request for additional resources for a non-FOIA-related program, a program that was transferred from the Bureau of Diplomatic Technology to the Bureau of Administration on Knowledge Management.

But I don't remember specifically. It's almost been a year.

Q. Will IAP be making a base budget fund increase request to the budget of bureau -- of the Bureau of Budget and Planning for this coming funding period?

MR. LYNCH: Objection. And to the extent it's deliberative, I instruct you not to answer.

A. I'm not going to answer. It's

litigation cases."

Q. Thank you. The Chief FOIA Officer Report references a backlog reduction plan; correct?

A. Yes.

Q. Are you familiar with that backlog reduction plan?

A. Yes. The March 2020 backlog reduction plan.

Q. Did you say it was a March 2020 backlog reduction plan? When was that implemented?

A. I believe it was March. It could be February, but it was in 2020.

Q. Turn to Exhibit 25. This is a document titled Department of State FOIA Backlog Reduction Plan. The date there is February 2020. It bears Bates stamps SCO-674 through SCO-678.

Does this document accurately set forth State's backlog reduction plan that you were just referring to?

A. Yes. This is the backlog reduction

plan I was referring to that is cited in the '24 Chief FOIA Officer Report.

Q. Thank you. And is this the backlog reduction plan that you reference in your Disclosure?

MR. LYNCH: Objection. Vague.

BY MR. RAJU:

Q. Is this the active backlog reduction plan that you reference in your expert Disclosure?

MR. LYNCH: Still vague. I don't know if there is a particular plan referenced in the Disclosure or not. Maybe there is.

BY MR. RAJU:

Q. Do you reference State's backlog reduction plan in your Disclosure? Withdrawn.

So I'll direct you to the page bearing Bates 675, under the title Backlog Reduction Plan. The first paragraph there reads:

"The department's FOIA backlog reduction plan is based on two key principles. One, maintaining distinct resources for both FOIA and FOIA litigation demands; and two, establishing

Q. Could you read what that second principle is?

A. "For the second principle, the department assessed its current and projected case processing. The department has taken proactive steps to acquire resources to support such a plan. To achieve annually increasing targets, the department is increasing its number of full-time FOIA employees by filling vacancies and adding new full-time contract positions."

Q. Thank you. So in connection with that second principle, State took proactive, quote, "proactive steps to acquire resources to support", end quote, it's backlog production plan; is that correct?

A. Yes. State took proactive steps.

Q. What proactive steps did State take to acquire resources to support this backlog reduction plan?

A. The first step, and this isn't in time order, the first step is having a new FOIA contract, FOIA case processing contract and hiring

FOIA contractors to augment FOIA FTE professionals. So those that can do everything up to leading an inherently governmental decision, which is reserved for government employees.

The second one is filling key FOIA vacancies. At this time I believe the Director for IPS was vacant, which is a key FOIA vacancy, as well as, this was pre-decisional at the time, but there were discussions underway about moving operations down to Charleston, South Carolina as well, which would reduce departmental overhead costs, but also enable to have a separate and distinct FOIA unit.

Because I was not in the role at the time, there may have been other avenues, but that would be me speculating.

Q. And those steps taken and resources acquired were done in support of this plan; is that correct?

MR. LYNCH: Objection. Vague.

A. So fast forward to our Chief FOIA Officer Report in 2024, Chief FOIA Officer Report,

the specific intent of hiring, State's hire at least 20 full-time contract employees and on-board employees.

Then it also discusses other improvements that are based on findings of other studies, which the GAO assessment in 2019, the GAO update, and the department developing new policies and procedures. So it's from my perspective, it's grounded in evidence.

Q. The plan continues on on page 676 in the first full paragraph there and it explains, quote, "in 2020 the department has developed this multi-year plan that allows for compliance with FOIA litigation demands and concurrent progress in reducing its FOIA backlog. This plan sets an annual monthly closure rate target for FOIA cases with a goal of eliminating its backlog so that it can keep up with new incoming FOIA requests," end quote.

Do you see that?

A. Yes.

Q. So the 2020 backlog reduction plan

expressly claimed its goal was for State to eliminate its backlog; correct?

A. It was a goal, yes.

Q. Yeah. And this is not the first time State has contemplated elimination of the backlog; is that correct?

A. From my knowledge, that's correct.

Q. What were other times State endeavored to eliminate its backlog?

A. Under Secretary Tillerson I believe there was a FOIA surge where there were additional internal resources dedicated to the FOIA program. Whether they were sworn service officers that were waiting on the next assignment or other personnel that were generally non-FOIA professionals that were detailed under the direction of the Office of Global Information Services.

It may have been to reduce the backlog or just increase our overall processing rate. I don't know the overall goal of the FOIA surge. It predates my time as the IPS Director.

I was in the organization as the

in the second bullet point, quote, "continue to eliminate the FOIA backlog", end quote.
Do you see that?
A. I see it.
Q. So it appears that State has represented internally that it would try to eliminate the backlog; correct?
A. Yes. In 2019, yes.
Q. Your expert Disclosure in paragraph 33, going back to Exhibit 1 now --
A. Which page?
Q. Paragraph 33 on page 19. And it continues on to page 20. The portion I'm going to be looking at is on page 20.
You wrote that, quote: "Backlog reduction and increased processing rate goals and metrics are reasonable; backlog elimination in the timeframe contemplated is not", end quote.
What is the timeframe contemplated that you reference there?
A. Day forward.
Q. Explain what you mean by that.

A. So the backlog reduction that I'm contemplating is not past efforts, it's backlog reduction and increasing processing rate goals for present day and in the future.

Mr. Wagner in his report to, in his final backlog reduction plan chart, he does not alter the department's numbers up until present day. I think he has a note that says something similar to that effect, day forward approach. And I believe it's at an annual growth rate that he suggests.

Q. And you write here that backlog elimination in the timeframe contemplated is not reasonable. Why is that?

A. Well, there is a whole host of factors. When you look at the environmental analysis of the increased rate of FOIA requests received year-over-year, the lack of additional resources the department has gotten towards its FOIA case processing operations, as well as the geopolitical context that we are currently in where it appears resources may be, and this is

or metric that we are hoping to achieve.

Q. So is it helpful in determining the level of resources you need, is having a backlog reduction plan important in determining what level of resources you need in order to reach the goals in your backlog reduction plan?

MR. LYNCH: Objection.

A. I believe I previously answered this, but any plan needs to account for the ends, ways and means.

So your goals, so they need to be specific measurable, achievable results oriented timely, as well as the ways, so how to go about that, and then the means, which are the resources, whether it's people or technological resources to achieve that end state.

Q. You earlier said that it wasn't reasonable to eliminate the backlog in the timeframe contemplated, going back to your expert Disclosure. Is there a timeframe for which it would be reasonable to endeavor to eliminate the backlog?

MR. LYNCH: Objection. Calls for speculation. You can answer.

A. So the recognition that we are in a volatile, uncertain, ambiguous environment, it would be very difficult for me to put into a plan today with the knowledge I have to say by this date State Department will reduce its backlog, knowing that that volatility that's external to State Department, the uncertainty with the number of FOIA requests that we may receive in fiscal year '25 and beyond, as well as the complexity of the information access and information management environment that we are in, to do that.

And let me expand upon that. That in OIP's most recent guidance, the backlog reduction plan is not set in stone. It is something that needs to be addressed, modified, changed over time. So speculating, when there is less volatility, uncertainty, there may be an opportunity, but I don't foresee that in the near future.

Q. Okay. Why -- you just testified that

processing rate, which then, you know, all else being equal, would potentially help reduce the backlog, or at least keep the State Department up with demand for new cases received in any given year.

Q. Earlier you testified about the importance of reviewing a backlog reduction plan and updating it, and the backlog reduction plan that's currently in place was first implemented in February of 2020; is that correct?

A. Yes. That's the date of the plan.

Q. Why wasn't the plan, the 2020 backlog reduction plan updated before today?

A. Well, one, I think we had the pandemic. I don't think. I know the pandemic basically was an unanticipated event that occurred that changed all the dynamics around that plan and also impacted future planning all the way through March of 2022.

At the time DAS Stein did not have an IPS Director and was waiting to hire in a Director to oversee that.

When I became the IPS Director in March 2023, obviously core FOIA statistics were a big part of my initial analysis; you know, what is the current state of affairs, what are we dealing with.

There were also other circumstances at play that could impact any future planning and they needed to materialize.  One being the completion of the FOIA case processing operations move to Charleston.

Two, in March of 2024 I believe when I was directed at the time by DAS Stein when I was the IPS Director to revise the backlog reduction plan, I needed good data.  That FOIA dashboard I discussed earlier was not put into effect I believe until the summer of 2024.

It took some time to modify, fully express, to build out the dashboard, do any IT enhancement, build the auto reporting capability. So when that data became available, I started to see what is trending so I can make an evidence-based decision.

And then lastly, we had the bureau modernization effort, which was a restructure of the office I previously discussed. IPS being changed to IAP, which went into effect in October of 2024.

So there were both structural changes happening, there were better data I wanted so I could make a well-informed decision, so I could have a plan that's grounded in reality based upon my education and experience with planning.

At the same time I wanted to make sure that I had a really good understanding of the environmental analysis of FOIA, FOIA requests coming in the door, as well as the complexities with FOIA in the department, the application of FOIA processing in the department, its operations, and all the different nuances that occur working in a disbursed federal agency.

Q. Okay. The backlog reduction plan that's in effect currently, the one that was first implemented in February of 2020, the goal of that plan was to eliminate the backlog; correct?

complete, it is still deliberative and pre-decisional. That will likely change in a future report.

Q. Okay. Speaking about the current backlog reduction plan, the one initially implemented in February 2020, and I want to focus on State's description of that plan in this Chief FOIA Officer Report.

Isn't it true that State describes one of the goals of the plan as, quote, "the goal of eliminating the backlog", end quote?

A. It describes it as with the goal of eliminating the backlog while keeping up with new incoming FOIA requests.

I think it's important to highlight that "and" sentence; and keeping up with new incoming FOIA requests.

At the time that this was written, the FOIA Annual Report is fiscal year 2023. I believe the department received approximately 15,000 cases that year. Now we are well over, we are over 22,000 cases, approximately 22,000 cases.

Because of that modernization, that gives me flexibility. If there was much lower demand signal coming from our FOIA litigation arm to then divert those resources to FOIA case processing, the lift as envisioned by DAS Stein in terms of the, you know, having your two separate units, each assigned to that, but also through the modernization initiative where we create a uniform FOIA Analyst position, whether you are GS-9 through 13 or a Branch Chief, allows us to be more agile.

So there is the potential for that. And that was a -- that was done on purpose to allow us to flex resources if we could, if the situation dictates, to help hedge against demands in different areas.

Q. And has State been able to flex resources in the way you described?

A. So there was an instance in I believe it was 2023 where -- there are different mechanisms to adjust resources. I noticed early on that there was a backlog accruing through an

FOIA space.

So my assumption would be approximately say 90 to 100 percent.

Q. Do contract employees have restrictions on actions they can take in the course of processing FOIA requests?

A. Yes. So they cannot make inherently governmental decisions, and there is a definition in the Federal Acquisition Regulations that covers inherently governmental decisions.

But generally speaking they cannot make the release determination. They can provide a recommendation. They cannot making a classification determination, they can provide a recommendation, that then is acted on by folks with, personnel, full-time employees, civil servants, or reemployed annuitants that have that inherently governmental capacity.

Q. Now speaking about non-contract employees but other full-time equivalent employees, do those employees generally have restrictions on the types of actions they can take

Appropriations Act?

A. I would have to read into that specific section of the public law to see what those specific requirements, if they had a figure for substantially reducing FOIA request response times, what Congressional reports were required from that, what State Department's response was. I do not know.

Q. Turning to FOIA litigation, what is the most common cause of FOIA litigations filed against State?

A. Not responding to the requests within the statutory time limits.

Q. And what burdens beyond processing the FOIA requests at issue in a FOIA litigation case are placed upon State by FOIA litigation?

A. Can you repeat that?

Q. Beyond responding to the requests at issue in a FOIA litigation, what burdens does State have in responding to FOIA litigations?

A. So FOIA litigation is unique because there are a few aspects to some FOIA litigation

A. Yes. As well as declarations, bond indices that explain why we classified something. You know, there is a whole host of additional information that's required in litigation that is not traditionally required in non-FOIA litigation.

Q. But the primary burden is producing the records responsive to the FOIA request; correct?

A. Yes. But often through litigation as well we are able to negotiate with the requester, narrow scope and change the confines of a FOIA request.

So there may be times where something, where litigation is pursued and then through the courts, or arbitration, magistrate processes we may work with the requester to narrow the scope, and sometimes FOIA litigation may be the only means in which we are able to do that because someone litigated right after that statutory time period.

Q. If State responds to a FOIA request within the statutory time limits, that requester

So the number of new FOIA litigations was relatively consistent over those three years; correct?

A. Yes.

Q. And over that same time period the number of requests received by State increased; correct?

A. Yes. Yes.

Q. So as a percentage of FOIA requests submitted to State, the number of new FOIA litigation cases decreased; correct?

A. Potentially, yes. If the number of cases increased year-over-year and the number of new FOIA litigation cases remained steady, then yes, that would be a reasonable assumption to make.

MR. RAJU: Let's take a two-minute break.

(Recessed at 5:54 p.m.)

(Reconvened at 6:03 p.m.)

THE WITNESS: May I make a point of clarification on Exemption 1 and classified

files all resided on the classified network and that data could not be migrated down to the equivalent enclave.

So if there was an unclassified document that was at one point in time upgraded or put on the higher-level system, it was not then migrated to the lower-level system due to cyber security concerns.

MR. RAJU: Okay.

BY MR. RAJU:

Q. Let's go to Exhibit 15, which is the 2024 Fiscal Year FOIA Annual Report, and in particular page 19, Section 5.B.(1), Disposition of all FOIA requests, all processed requests.

I just want to circle back on something you testified earlier about, the "still interested letters". When a requester does not respond to a "still interested letter" and the request is closed, is that categorized as a request withdrawn in this Annual Report?

A. So in the Department of Justice Annual FOIA Report Handbook, a request withdrawn

is the request was closed because the requester withdrew the request.

There is a note there that says a request can also be closed using this disposition when a requester fails to respond to a still interested inquiry after a reasonable amount of time, and in parentheses "no less than 30 working days". This is known as a constructive withdrawal.

So "still interested letters" I believe are encapsulated in that figure, in the request withdrawn figure.

Q. And this figure in the 2024 Annual Report for requests withdrawn, 4,452, are those requests considered processed requests?

A. They are captured in the agency overall total in the far right column.

Q. And that's the same for duplicate requests; correct? They are also considered processed requests?

A. Yes.

Q. For duplicate requests, after they

requests and not duplicates.

Even if State Department previously released information, if there was new information, it would be processed as its own unique request.

Q. Will a request be identified as duplicative before or after it's placed on the simple or complex track?

A. So identifying duplicate requests is a major challenge given the volume of requests State Department receives. That is one major aspect of why we are looking at technological solutions.

There is a public presentation I gave on a FOIA AI pilot to identify duplicate or near duplicate requests for information by using request letters. It is extremely hard for State Department to do that analysis, given that requests for, that would be considered duplicate coming in from many requesters do not often come in at the same exact time.

Q. Ultimately, what percent of review

resources does FOIA litigation take up?

A. So the long-standing figure, which needs to be reanalyzed based upon increased staffing, is approximately 90 percent.

Q. Why does it need to be reanalyzed?

A. Staffing numbers change over time. The FOIA case processing unit has recently had an influx of staff.

But one thing FOIA case processing does not heavily rely upon is contractor and reemployed annuitant resources, which are part-time employment. So there is data, as well as other agency resources, like the Office of Legal Advisor, FOIA case processing.

So there is the potential that that figure can be, may change slightly potentially just given that FOIA case processing has more staff today than -- more full-time government employees than it may have had in previous years.

MR. LYNCH: And I think that's seven hours.

MR. RAJU: My last question -- my

**Errata Sheet**

24:15 "2014" should be "2015" I cited the incorrect year.

29:11 "2014" should be "2015" Same as above.

45:2 "ran" should be "run" transcription error

65:17-18 "we talk about the proactive, using" should be "we talk about using" transcription error

73:7 "process" should be "processed" transcription error

77:20 "because multiple" should be "because it is multiple" transcription error

77:5 "so we toll the requests for these" should be "so we toll these" transcription error

77:12 "capture-like" should be "CAPTCHA" transcription error

77:20 "because multiple" should be "because it is multiple" transcription error

88:13 "be cause" should be "be the cause" transcription error

106:2 "process" should be "processing" transcription error

111:3 "interest" should be "interested" transcription error

111:13 "interest" should be "interested" transcription error

112:14 "tenneled" should be "ten oldest" transcription error

113:11-12 "Visa for continuation" should be "Visa for consultation" transcription error

114:6 "there is" should be "there are"

115:2-4 Should read "It's a simplified way of doing it. Now, depending upon the action office, there may be a" transcription error

117:8 "holily" should be "holistically" transcription error

117:17 "more efficiency?" should be "more efficient?" transcription error

121:10 "a set of" should be "instead of" transcription error

121:12 "thousand" should be "thousands" transcription error

127:10 "underline" should be "underlying" transcription error

127:15 "is" should be "are" transcription error

127:19 "years" should be "year's'" transcription error

127:20 "years" should be year's" transcription error

132:15-16 "There is major discrepancies" should be "There may be discrepancies" transcription error

133:19 backlog" should be "backlogged" transcription error

137:14 "calculate" should be "calculating" transcription error

137:19 "So no" should be "no" transcription error

137:20 "is" should be "are" transcription error

139:8 "through-put of the" should be "throughput" transcription error

144:12 "Federal Institute" should be "Federal Executive Institute" transcription error

146 3 "There is" should be "there are" Transcription error

146:11 "remove" should be "reduce" transcription error

164:1 "State's hire" should be "State has hired" transcription error

165:13 "sworn" should be "foreign" transcription error

169:18-19 "Kerry Chabalka" should be "Carrie Cabelka" transcription error

173:17 "swell" should be "well" transcription error

184:16 "U.S." should be "DOS" transcription error

192:8 "producing" should be "produced" transcription error

203:4-5 "back on" should be "backlog" transcription error

206:20 "There is" should be "There are" transcription error

207:3 "centralized" should be "decentralized" transcription error

208:2 "There is" should be "there are" transcription error

208:13 "effects" should be "effect" transcription error

208:22 "affect" should be "effect" transcription error

214:18-19 "that have" should be "that has" transcription error

218:20 "much" should be "of" transcription error

219:9 "much" should be "of" transcription error

219:10-11 "bureau administration" should be "Bureau of Administration" transcription error

227:1 "ran" should be "run" transcription error

241:4 "prior department's" should be "department's prior" transcription error

247:2 "ran" should be "run" transcription error

249:16 "of" should be deleted transcription error

254:20 "recommending" should be "recommendations" transcription error

256:15 "date" should be "data transcription error

258:15 "response and then it's reviewed on" should be "responsiveness review" transcription error

277:4 "communication" should "communities" transcription error

278:7 "five Is" should be "Five Eyes" transcription error

292:2 "wouldn't" should be "would" transcription error

295:9 "pros" should be "prose" Transcription error

297:13 "making" should be "make" transcription error

303:16 "2020" should be "2018" transcription error

306:1 "bond" should be "*Vaughn*" transcription error

316:9-10 should read "processing does heavily rely upon contractor and not reemployed annuitant resources" transcription error

316:12 "So there is data" should be removed so that the sentence reads "As well as..." transcription error

TIMOTHY J. KOOTZ

18 FEB 2025
DATE