# EXHIBIT 15

| | |
|---|---|
| RYAN SCOVILLE,<br><br>                      Plaintiff,<br><br>      v.<br><br>U.S. DEPARTMENT OF STATE,<br><br>                      Defendant. | Civil Action No. 2:22-cv-91-NJ |

## DECLARATION OF OONA A. HATHAWAY

I, Oona A. Hathaway, declare under penalty of perjury that the following is true and correct:

1. I am currently employed as Gerard C. and Bernice Latrobe Smith Professor of International Law at Yale Law School and Director of the Yale Law School Center for Global Legal Challenge ("Yale GLC"). I have recently been nominated to be President-elect of the American Society for International Law. I am also a member of the Advisory Committee on International Law for the Legal Adviser at the United States Department of State, and I also serve as a Reporter for the forthcoming *Restatement of the Law (Fourth): The Foreign Relations Law of the United States*. The statements in the foregoing declaration are based on my personal knowledge.

2. I submit this declaration in support of Plaintiff's motion for summary judgment.

3. I have been employed as a professor at Yale Law School since 2009, and I founded and have served as the Director of the Yale GLC since 2011.

4. The Yale GLC is an independent center within Yale Law School that bridges the divide between the legal academy and legal practice on global legal issues. It provides a forum

where academic experts and students engage with public and private sector actors responsible for addressing global legal challenges. By bringing these communities together, the Center aims to inject new ideas into the public debate and grow a new generation of lawyers with a sense of their capacity and responsibility to use international law, foreign affairs law, and national security law to address the nation's challenges.

5. In my role, I teach and mentor students and produce academic scholarship concerning pressing matters related to national security, foreign policy, and international law. I have published more than fifty law review articles on these topics. I am also Executive Editor of and regular author at *Just Security*, and I write often for popular publications such as *The Washington Post*, *New York Times*, and *Foreign Affairs*.

6. I submit FOIA requests to various government agencies, and I have submitted multiple requests to the United States Department of State ("State").

7. My work relies significantly on timely access to information obtained through FOIA. This access is essential for producing and publishing academic research related to diplomacy, foreign policy, and national security, as well as for engaging in policy discussions related to statutory transparency requirements and drafting relevant portions of *The Restatement (Fourth) of Foreign Relations Law*. Delays in processing FOIA requests have directly hindered the ability of my organization, my coauthors, my students, and myself to publish academic articles and furnish information to Congress based on full and complete data.

8. My organization and I expect to continue submitting FOIA requests to State in the future as new research projects arise.

9. On December 29, 2020, I submitted one FOIA request (the "2020 Request") on behalf of the Yale GLC to the U.S. Department of State's ("State") Office of Information

Programs and Services. State assigned the number F-2021-02205 to the Request. Since May 19, 2021, my 2020 Request has been subject to litigation in the U.S. District Court for the District of Connecticut.

10. The 2020 Request sought records held by State's Office of Treaty Affairs (the "Office") related to nonbinding international understandings and arrangements. Specifically, the 2020 Request sought the following for the period from January 1, 1989 to December 31, 2019: (i) unclassified guidance, policies, directives, rules, or regulations that (a) govern the Office's own internal process for making binding/nonbinding determinations, (b) aid agencies in determining whether agreements are binding, and (c) aid State components and other agencies in drafting nonbinding agreements; (ii) unclassified records associated with nonbinding documents, including lists, records, or descriptions of those documents; and (iii) unclassified nonbinding understandings or arrangements with foreign countries or international organizations in the Office's possession.

11. The records requested from State under the 2020 Request consist of files related to nonbinding agreements and rules and regulations governing their creation.

12. Access to the records requested from State is essential for producing scholarly work on nonbinding international agreements, as well as meaningfully engaging in policy discussions with Congress, policymakers, and other scholars on government transparency and the role of the various branches and agencies of government in U.S. diplomacy.

13. Timely access to records requested from State is essential because State is the foremost organ of diplomacy in the U.S. government. The nonbinding agreements it signs, as well as the rules, regulations, and practices governing them, not only reveal the increasing

3

prevalence of such agreements but also reflect growing opacity and unaccountability in U.S. foreign relations, including to Congress.

14. Although unclassified, the information requested is not available from other sources or, if partially available, lacks the completeness and reliability of the records held by State.

15. Prior to litigation, communication from State regarding my pending request was highly infrequent and unhelpful, with State providing only vague updates on processing timelines.

16. After I submitted the 2020 Request on December 29, 2020, I received an email on January 5, 2021, acknowledging the request. The January 5 email stated that the Office of Information Programs and Services would "not be able to respond within the 20 days provided by the statute due to 'unusual circumstances.'" It cited "the need to search for and collect requested records from other Department offices or Foreign Service posts." Contrary to statutory requirements, the January 5 email provided no estimated date of completion.

17. I received no further response within either the 20-day response period provided in FOIA, 5 U.S.C. § 552(a)(6)(A)(i), or the 10-day extension period, §552(a)(4)(A)(viii)(II)(aa).

18. On March 16, 2021, more than two months after State acknowledged the 2020 Request, counsel emailed the department to inquire as to "the current status of this request, and an estimated date of completion." State did not respond.

19. Two weeks later, on March 30, 2021, counsel emailed State again. State responded in an unsigned email on April 5, 2021, stating that there would be a delay in processing my request. It again failed to provide any estimated date of completion.

4

20. State thus constructively denied my FOIA request—and my administrative remedies were thus exhausted—because State failed to comply with FOIA's time limits. 5 U.S.C. § 552(a)(6)(C).

21. Because of State's failure to provide a substantive response, I filed a complaint on May 19, 2021, against State in the U.S. District Court for the District of Connecticut.

22. Only after initiating litigation did State provide a substantive response to the Request.

23. After I filed my lawsuit, State began producing records responsive to Parts I and III of my Request, according to our stipulated agreement. Direct productions of records originating in State were completed by August 2023, almost three years after I had submitted my request.

24. Production of records referred to other agencies for the 2020 Request remain unfinished as of the signing of this declaration.

25. Previously, on March 16, 2017, I also submitted one FOIA request (the "2017 Request") on behalf of the Yale GLC to State's Office of Information Programs and Services. State assigned the number F-2017-06190 to the request.

26. My 2017 Request was subject to litigation in the U.S. District Court for the District of Connecticut from December 7, 2017, through August 8, 2019.

27. The 2017 Request sought records held by State's Office of the Assistant Legal Adviser for Treaty Affairs documenting the "precise citation[s] of legal authority" for unclassified international agreements, other than Article II treaties, submitted to the President of the Senate and Speaker of the House of Representatives pursuant to the Case-Zablocki Act of 1979, 1 U.S.C. § 112b(a), and 22 C.F.R. § 181.7(c).

28. The Case-Zablocki Act requires the Secretary of State to "transmit to the Congress the text of any international agreement . . . other than a treaty, to which the United States is a party as soon as practicable after such agreement has entered into force . . . but in no event later than sixty days thereafter." 1 U.S.C. § 112b(a). It also requires State to promulgate "rules and regulations" to ensure that State complies with the Act. *Id.* § 112b(f). State's applicable regulations provide that all unclassified international agreements, other than treaties, "shall be transmitted by the Assistant Legal Advisor for Treaty Affairs to the President of the Senate and the Speaker of the House of Representatives" no later than 60 days after "the entry into force of such agreements." 22 C.F.R. § 181.7(a). The Assistant Legal Advisor for Treaty Affairs "shall also transmit to the President of the Senate and to the Speaker of the House of Representatives . . . background information" for "each agreement." *Id.* § 181.7(c). State's regulations specify two categories of "background information" that are to be transmitted to Congress: "information explaining the agreement" and "precise citation[s] of legal authority." *Id.*

29. These records requested under the 2017 Request consist of unclassified cover letters accompanying unclassified international agreements during the previous four presidential administration, from the dates of January 20, 1989, to January 20, 2017.

30. Access to the records for the 2017 Request from State was essential for producing scholarly work on executive agreements that are entered into by the President without the subsequent approval by Congress required of Article II treaties, as well as meaningfully engaging in policy discussions with Congress, policymakers, and other scholars on government transparency and the role of the various branches and agencies of government in U.S. diplomacy.

31. This information is not available from other sources. State does not publicly specify which of three sources of authority—Article II treaty-making power, "inherent"

6

Executive constitutional authority, or congressional statute (and, if so, which one)—underlie each unclassified international agreement to which the United States is a party.

32. Timely access to records requested from State under the 2017 Request was essential because executive agreements have had a significant impact on the nation's economic and security interests, regulating numerous subjects including trade policy, nuclear energy, criminal law enforcement, and environmental protection. By shedding light on the legal authorities underpinning non-Article II international agreements, these records were critical to educating scholars, students, and the public at large about the scope and limits of the Executive's international lawmaking authority.

33. Prior to litigation, communication from State regarding my pending request was highly infrequent and unhelpful, with State providing only vague updates on processing timelines.

34. After I submitted the 2017 Request on March 16, 2017, I received a letter on March 22, 2017, acknowledging the request for records but denying expedited processing and a waiver or reduction of fees. Contrary to statutory requirements, the March 22 response provided no estimated date of completion.

35. On June 7, 2017, I filed an administrative appeal challenging State's denial of my request for a waiver or reduction of fees. On June 14, 2017, State granted my request for a waiver or reduction of fees. Contrary to statutory requirements, the June 7 response again provided no estimated date of completion.

36. I received no determination on 2017 Request within either the 20-day response period provided in FOIA, 5 U.S.C. § 552(a)(6)(A)(i), or the 10-day extension period,

§ 552(a)(4)(A)(viii)(II)(aa). By December 7, 2017, it had been 176 days since State's June 14, 2017, communication and 266 days since the 2017 Request was submitted.

37. State thus constructively denied my FOIA request—and my administrative remedies were thus exhausted—because State failed to comply with FOIA's time limits. 5 U.S.C. § 552(a)(6)(C).

38. Because of State's failure to provide a substantive response, I filed a lawsuit on December 7, 2017, against State in the U.S. District Court for the District of Connecticut.

39. Only after initiating litigation did State provide a substantive response to the Request.

40. In March 2018, my counsel began negotiating a rolling production schedule with State.

41. State made its first production on April 18, 2018, more than a year after I had filed the 2017 Request on March 16, 2017. Productions of records for the 2017 Request were completed by December 18, 2018, more than 21 months after I had submitted the 2017 Request.

42. The delays in receiving the requested documents under both my 2020 and 2017 Requests have had a significant negative impact on my research, writing, and contributions to policymaking.

43. State's delay in responding to my 2020 Request concerning nonbinding agreements necessitated that I delay publication of a law review article on the topic for close to a year; I eventually decided to publish the article while still awaiting all of the requested materials. State's delay in responding to my 2017 Request concerning non-Article II executive agreements similarly set back my writing and publication of a law review article on the topic. Moreover, State's delays in responding to both my 2017 and 2020 requests hindered my ability to fully

8

advise Congress on the passage of the National Defense Authorization Act (NDAA) provision for transparency requirements that applied to executive and nonbinding agreements, passed in fiscal year 2023.

44. Given the nature of State's delays, I anticipate future harm to upcoming research projects as new requests to State will likely face similar processing issues. Addressing State's failure to satisfy FOIA's timing requirements is essential for preserving FOIA's purpose of promoting transparency and access to information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2025
New Haven, CT

/s/ Oona A. Hathaway<br>Oona A. Hathaway